1　SALLIE KIM, State Bar No. 142781
　　KIMBERLY A. DONOVAN, State Bar No. 160729
2　GCA LAW PARTNERS LLP
　　1891 Landings Drive
3　Mountain View, California 94043
　　Telephone: (650) 428-3900
4　Facsimile: (650) 428-3901

5　Attorneys for Defendants GEORGE CHOI,
　　LUIZ DASILVA, and THERATIVE, INC.,
6　formerly known as DERMACARE, INC.

7　　　　　　　UNITED STATES DISTRICT COURT

8　　　　　　NORTHERN DISTRICT OF CALIFORNIA

9

10　JOSEPH NEEV,　　　　　　　　　）　Case No.  C-08-02860-PVT
　　　　　　　　　　　　　　　　　　）
11　　　　　Plaintiffs,　　　　　　）　NOTICE TO PARTIES AND COUNSEL OF
　　　　　　　　　　　　　　　　　　）　REMOVAL PURSUANT TO
12　　　　　vs.　　　　　　　　　　 ）　28 U.S.C. § 1441(b)
　　　　　　　　　　　　　　　　　　）　[Federal Question]
13　DOES 1-100; GEORGE CHOI, an individual,　）
　　LUIZ DASILVA, an individual, THERATIVE,　）　Alameda County Superior Court Case No.
14　INC., an individual; DERMACARE, INC., a　 ）　RG 08379458
　　Delaware corporation;　　　　　　　　　）
15　　　　　　　　　　　　　　　　　　）
　　　　　Defendants.　　　　　　　　　　）
16　　　　　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　）
17　_____ ）

18

25

20　TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

21　　　　　PLEASE TAKE NOTICE that A Notice of Removel of this action was filed in the

22　United States District Court for the Northern District of California on June 9, 2008, under case

23　number: C-08-02860-PVT.

24　　　　　A copy of the Notice of Removal is attached to this Notice and is served and filed

25　herewith as Exhibit A., and a copy of the Proof of Services is attached as Exhibit B.

26

27

28

　　　　　　　　　　　　　　　　　　1

DATED:   June 9, 2008

GCA LAW PARTNERS LLP

By _____
        Sallie Kim

Attorneys for Defendants GEORGE
CHOI, LUIZ DASILVA, and
THERATIVE, INC., formerly known as
DERMACARE, INC.

2

# EXHIBIT A

1   SALLIE KIM, State Bar No. 142781

2   KIMBERLY A. DONOVAN, State Bar No. 160729
GCA LAW PARTNERS LLP

3   1891 Landings Drive
Mountain View, California 94043

4   Telephone: (650) 428-3900
Facsimile: (650) 428-3901

5   Attorneys for Defendants GEORGE CHOI,
LUIZ DASILVA, and THERATIVE, INC.,

6   formerly known as DERMACARE, INC.

ENDORSED
FILED
ALAMEDA COUNTY

JUN 0 9 2008

CLERK OF THE SUPERIOR COURT
By KMEL DHILLON  Deputy

7           SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                     COUNTY OF ALAMEDA

9

10   JOSEPH NEEV,                   )   Case No. RG 08379458
                                    )

11       Plaintiffs,               )   NOTICE TO STATE COURT CLERK OF
                                    )   THE FILING OF THE NOTICE OF

12           vs.                   )   REMOVAL
                                    )

13   DOES 1-100; GEORGE CHOI, an individual, )
LUIZ DASILVA, an individual, THERATIVE, )

14   INC., an individual; DERMACARE, INC., a )
Delaware corporation;               )

15                                     )
      Defendants.               )

16                                     )
                                    )

17   _____ )

18

25

20   TO THE CLERK OF THE SUPERIOR COURT OF ALAMEDA COUNTY:

21         You are hereby notified that defendants GEORGE CHOI, LUIZ DASILVA, and

22   THERATIVE, INC. (formerly known as DERMACARE, INC.) (collectively, "Defendants")

23   have filed a Notice of Removal of this action in the United States District Court for the

24   Northern District of California, on June 9, 2008.

25         A copy of the Notice of Removal is attached to this Notice and is served and filed

26   herewith. Pursuant to 28 U.S.C. § 1446(d), this Notice shall effect the removal and the State

27   court shall proceed no further unless and until the case is remanded by the federal district

28   court.

                                1

1    DATED:   June 9, 2008                    GCA LAW PARTNERS LLP

2

3

4                                            By _____
                                                    Sallie Kim
5

6    Attorneys for Defendants GEORGE
     CHOI, LUIZ DASILVA, and
     THERATIVE, INC., formerly known as
7    DERMACARE, INC.

8

9

10

11

12

13

14

15

16

17

18

25

20

21

22

23

24

25

26

27

28

                                  2

**EXHIBIT 1**

SALLIE KIM, State Bar No. 142781
KIMBERLY A. DONOVAN, State Bar No. 160729
GCA LAW PARTNERS LLP
1891 Landings Drive
Mountain View, California 94043
Telephone: (650) 428-3900
Facsimile: (650) 428-3901

Attorneys for Defendants GEORGE CHOI,
LUIZ DASILVA, and THERATIVE, INC.,
formerly known as DERMACARE, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JOSEPH NEEV, | Case No. C08 02860 PVT |
| Plaintiffs, | NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. § 1441(b) [Federal Question] |
| vs. | |
| DOES 1-100; GEORGE CHOI, an individual, LUIZ DASILVA, an individual, THERATIVE, INC., an individual; DERMACARE, INC., a Delaware corporation; | Alameda County Superior Court Case No. RG 08379458 |
| Defendants. | |

TO THE HONORABLE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA AND THE CLERK OF THE COURT:

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. § 1441(b), defendants GEORGE CHOI, LUIZ DASILVA, and THERATIVE, INC. (formerly known as DERMACARE, INC.) (collectively, "Defendants") hereby remove this action to this Court. In support of the removal of this action, Defendants state the following:

1.      On or about April 1, 2008, an action was commenced in the Superior Court of Alameda County, State of California. The First Amended Complaint was filed on or about

1

May 6, 2008.  A copy of the original Complaint (with Summons) is attached as "Exhibit A,"
and a copy of First Amended Complaint is attached as "Exhibit B."

2.     The first date any of the Defendants was served with the First Amended
Complaint was May 9, 2008, when a copy of the First Amended Complaint was served via
U.S. Mail on counsel to the Defendants.

3.     This action is a civil action of which this Court has original jurisdiction under
28 U.S.C. § 1331, and is one which may be removed to this Court by Defendants pursuant to
the provisions of 28 U.S.C. §1338(a) in that it arises under the patent laws of the United States.
This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C.
§1367, which grants federal district courts supplemental jurisdiction over state claims claims
that arise out of the same claim or controversy.

4.     All other Defendants who have been served with the Summons and First
Amended Complaint are making this motion.  There are no other defendants in this action.


DATED:   June 9, 2008                                    GCA LAW PARTNERS LLP



                                                         By _____
                                                                   Sallie Kim

                                                         Attorneys for Defendants GEORGE
                                                         CHOI, LUIZ DASILVA, and
                                                         THERATIVE, INC., formerly known as
                                                         DERMACARE, INC.

2

**EXHIBIT A**

SUM-100

## SUMMONS
### *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
DOES 1-100; GEORGE CHOI, an individual; LUIZ DASILVA, an
individual; THERATIVE, INC., a Delaware corporation;
DERMACARE, INC., a Delaware corporation

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JOSEPH NEEV

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

ENDORSED
FILED
ALAMEDA COUNTY

APR - 1 2008
E. BAKER

CLERK OF THE SUPERIOR COURT

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* | CASE NUMBER: *(Número del Caso):* |
|---|---|
| Superior Court of California, County of Alameda 1225 Fallon Street Oakland, California 94612-4293 | RG 08379458 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Kenneth G. Parker (SBN 182911)
Teuton, Loewy & Parker LLP, 3121 Michelson Drive, Suite 250, Irvine, CA 92612; Tel. (949) 442-7100

Pat S. Sweeten

| DATE: *(Fecha)* APR - 1 2008 | Clerk, by *(Secretario)* E. BAKER / Executive Officer/Clerk of the Superior Court | , Deputy *(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED: You are served**

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* THERATIVE Inc., a DELAWARE corporation

   under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
American LegalNet, Inc. | www.USCourtForms.com

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Kenneth G. Parker (SBN 182911)<br>Teuton, Loewy & Parker LLP<br>3121 Michelson Drive, Suite 250<br>Irvine, CA 92612<br>TELEPHONE NO: 949/442-7100  FAX NO: 949/442-7105<br>ATTORNEY FOR (Name): Plaintiff Joseph Neev | *Endorsed*<br>**FILED**<br>ALAMEDA COUNTY<br><br>APR - 1 2008<br><br>CLERK OF THE SUPERIOR COURT<br>By E BAKER<br>Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Alameda
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS: same as above
CITY AND ZIP CODE: Oakland, California 94612-4293
BRANCH NAME: Rene C. Davidson Courthouse

CASE NAME:
JOSEPH NEEV V. DOES 1-100

CASE NUMBER: RG08379458

| CIVIL CASE COVER SHEET | | Complex Case Designation | | |
|---|---|---|---|---|
| [✓] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT: | |

Items 1–6 below must be completed (see instructions on page 2).

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[✓] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [✓] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. [ ] Large number of separately represented parties
b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [ ] Substantial amount of documentary evidence
d. [ ] Large number of witnesses
e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [ ] Substantial postjudgment judicial supervision

BY FAX

3. Remedies sought (check all that apply): a. [✓] monetary  b. [✓] nonmonetary; declaratory or injunctive relief  c. [✓] punitive
4. Number of causes of action (specify): 6
5. This case [ ] is [✓] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: April 1, 2008

Kenneth G. Parker
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | CIVIL CASE COVER SHEET | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

American LegalNet, Inc.
www.FormsWorkflow.com

1  KENNETH G. PARKER (SBN 182911)
       kparker@tlpfirm.com
2  ROBERT G. LOEWY (SBN 179868)
       rloewy@tlpfirm.com
3  TEUTON, LOEWY & PARKER LLP
   3121 Michelson Drive, Suite 250
4  Irvine, California 92612
   Telephone:  (949) 442-7100
5  Facsimile:  (949) 442-7105

6  Attorneys for Plaintiff
   JOSEPH NEEV
7

8              SUPERIOR COURT FOR THE STATE OF CALIFORNIA

9                        COUNTY OF ALAMEDA

10

11  JOSEPH NEEV,                      )  Case No.:
                                      )
12                  Plaintiff,        )     08379458
                                      )
13          v.                        )  COMPLAINT FOR:
                                      )
14  DOES 1-100; GEORGE CHOI, an       )  (1) CONVERSION;
    individual; LUIZ DASILVA, an      )  (2) MISAPPROPRIATION OF TRADE
15  individual; THERATIVE, INC., a    )  SECRETS;
    Delaware corporation; DERMACARE,  )  (3) BREACH OF IMPLIED
16  INC., a Delaware corporation,     )  CONTRACT;
                                      )  (4) QUANTUM MERUIT;
17                  Defendants.       )  (5) PROMISSORY ESTOPPEL; AND
                                      )  (6) ACCOUNTING
18                                    )
                                      )
19                                    )         BY FAX
20
21
22
23
24
25
26
27
28

                            COMPLAINT

ENDORSED
FILED
ALAMEDA COUNTY
APR - 1 2008
E. BAKER
CLERK OF THE SUPERIOR COURT

1    Plaintiff Joseph Neev files this Complaint against Defendants as set forth more
2  fully below.

3

4    **JURISDICTION AND VENUE**

5    1.    Venue of this action in this Court is proper because all defendants
6  reside in this jurisdiction, the wrongs complained of occurred in this jurisdiction, or
7  the material agreements and discussions occurred in this jurisdiction.

8

9    **PARTIES**

10    2.    Joseph Neev is an individual residing in Orange County, California.

11

12    3.    Plaintiff is informed and believes that Defendant Louis DaSilva
13  "DaSilva" is an individual who resides in California.

14

15    4.    Plaintiff is informed and believes that Defendant George Choi "Choi"
16  is an individual who resides in California.

17

18    5.    Plaintiff is informed and believes that Defendant Therative, Inc.
19  ("Therative") is a corporation incorporated under the laws of the State of Delaware
20  and that is headquartered in the County of Alameda at 6248 Preston Avenue,
21  Livermore, California 94551.  Plaintiff is informed and believes that Therative is the
22  successor-in-interest of DermaCare, Inc.

23    6.    Plaintiff is informed and believes that DermaCare, Inc. is a Delaware
24  corporation that is the predecessor-in-interest of Therative.  DermaCare, Inc. is not a
25  corporation in good standing in the State of California.  Plaintiff is informed and
26  believes that DermaCare was and is headquartered in the County of Alameda at the
27  same address as Therative.

28

7.    Defendants DOES 1 through 100, inclusive, are sued herein under fictitious names. Their true names and capacities, whether individual, corporate, associate or otherwise, are unknown to Plaintiff. When their true names and capacities are ascertained, Plaintiff will amend this complaint by inserting their true names and capacities herein. Plaintiff is informed and believes and thereon alleges that each of the fictitiously-named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages were proximately caused by those defendants. Each reference in this complaint to "defendant," "defendants," or a specifically named defendant refers also to all defendants sued under fictitious names.

8.    Plaintiff is informed and believes that at all times mentioned herein defendants, and each of them, were the agents, principals, employees, servants, partners, joint venturers and representatives of each other. In doing the acts hereinafter alleged, they were acting within the scope and course of their authority as such agents, principles, employees, servants, partners, joint venturers, and representatives, and were acting with the permission and consent of the other defendants. As such each defendant is liable for the wrongful acts of the other defendants.

### VENUE

9.    Venue is appropriate in the County of Alameda in one ore more of the Defendants, including Defendant Therative, reside in the County of Alameda.

### FACTS COMMON TO ALL CAUSES OF ACTION

10.    Neev is the sole inventor of an invention that he disclosed to Defendants in confidence. Prior to the disclosure, Defendants agreed not to disclose the nature of the invention to others without Neev's consent. The invention was not

publicly known, and was the subject at the time of disclosure to a confidential provisional patent application. To induce Neev to disclose the confidential information and invention to Defendants, Defendants promised Neev that they would hold all information in confidence and only use it as and if further agreed by Neev. In addition to disclosing the invention itself to Defendants, Neev disclosed in confidence, and Defendants agreed to keep confidential, several marketing ideas surrounding its application, as well as complementary products to the invention (the "Confidential Information").

11.   After viewing the invention and the Confidential Information, defendants became very excited about the invention, the Confidential Information, and its prospects. Defendants Choi, Da Silva and certain Doe Defendants proposed that they and Neev form a corporation to exploit and market the invention and its complementary products. Discussions progressed regarding this business arrangement. During this time, Defendants continued to examine the invention and utilize the Confidential Information for the benefit of the future corporation the parties were actively discussing.

12.   At all times, Neev understood that the invention and the Confidential Information were to be kept confidential at all times and would be only used as Neev agreed, since they belonged to Neev and were his property.

13.   Defendants have, without Neev's consent, used Neev's invention and the Confidential Information for their own profit. Defendants have continued to do even after being notified of, and with full knowledge of, Neev's ownership of the invention and the Confidential Information.

COMPLAINT

# FIRST CAUSE OF ACTION
## CONVERSION
### (Against All Defendants)

14.    Plaintiff repeats and re-alleges each and every allegation of paragraphs 1 through 13 as though fully set forth herein.

15.    The invention and Confidential Information are the property of Neev.

16.    Defendants have converted the invention and Confidential Information for their own use and benefit without Neev's consent or participation.  To this very day, Defendants have continued to use the invention and the Confidential information for their own purposes and benefit.

17.    Defendants' wrongful conversion has damaged Neev and Defendants have wrongfully benefited from the conversion.

18.    Defendants' conversion was willfull, malicious and intentional, and justifies the award of punitive damages.

# SECOND CAUSE OF ACTION
## MISAPPROPRIATION OF TRADE SECRETS
### (Against All Defendants)

19.    Plaintiff repeats and re-alleges each and every allegation of paragraphs 1 through 18 as though fully set forth herein.

20.    The invention and Confidential Information were trade secrets owned by Neev.

21.    Defendants used the trade secrets without Neev's consent, and Defendants knew or had reason to know that their knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. To the extent Neev initially consented to Defendants' evaluation of the trade secrets, Defendants obtained the consent under false pretenses. Moreover, Defendants continued to use the trade secrets long after Neev withdrew his consent to their use, and in fact continue to use them to this day.

22.    Neev has been damaged by Defendants' misuse of the trade secrets, and Defendants have been unjustly enriched by their misuse of the trade secrets. Neev therefore seeks both actual damages and disgorgement of improperly gained profits.

23.    Defendants' misappropriation was willfull, malicious and intentional, and justifies the trebling of actual damages, the award of attorneys' fees and other relief as is just and proper.

## THIRD CAUSE OF ACTION
## BREACH OF IMPLIED CONTRACT
### (Against All Defendants)

24.    Plaintiff repeats and re-alleges each and every allegation of paragraphs 1 through 12 to the extent such allegations are consistent with this cause of action as though fully set forth herein. Plaintiff does not intend to incorporate any allegation that contradicts the allegations contained in this cause of action, and any contradictory allegations are not incorporated herein. This cause of action is pleaded in the alternative.

25.    Neev conveyed valuable ideas and work product to Defendants, who are in the business of considering such ideas and paying for them, and who voluntarily accepted the ideas and work product knowing that they were provided for a price. The circumstances preceding and attending that disclosure, together with the conduct of Defendants, show that they acted with knowledge of the circumstances, accepted Neev's ideas and agreed to pay for them.

26.    Defendants' conduct created an implied-in-fact contract between Defendants and Neev by which Defendants promised to pay Neev the reasonable value, as established by their later discussions, for Neev's provision of his ideas, creations, and efforts to Defendants.

27.    Defendants have not paid Neev.

28.    Due to Defendants' breach, Neev has been damaged in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
## QUANTUM MERUIT
### (Against All Defendants)

29.    Plaintiff repeats and re-alleges each and every allegation of paragraphs 1 through 12 to the extent such allegations are consistent with this cause of action as though fully set forth herein. Plaintiff does not intend to incorporate any allegation that contradicts the allegations contained in this cause of action, and any contradictory allegations are not incorporated herein. This cause of action is pleaded in the alternative.

COMPLAINT

30.    Neev provided the invention and Confidential Information to Defendants. The invention and Confidential Information have value. Defendants continue to use the invention and Confidential Information for their own benefit, and this constitutes a continual misappropriation of the benefits of Neev's invention.

31.    In good conscience, Defendants owe Neev the value of the invention and the Confidential Information and the value derived from use of it.

## FIFTH CAUSE OF ACTION
## PROMISSORY ESTOPPEL
### (Against All Defendants)

32.    Plaintiff repeats and re-alleges each and every allegations of paragraphs 1 through 12 to the extent such allegations are consistent with this cause of action as though fully set forth herein. Plaintiff does not intend to incorporate any allegation that contradicts the allegations contained in this cause of action, and any contradictory allegations are not incorporated herein. This cause of action is pleaded in the alternative.

33.    Defendants promised Neev that if Defendants used the invention and Confidential Information that Neev would receive a percentage interest in the company to be formed by Defendants for purposes of exploiting and profiting from use of the invention and Confidential Information, as well as certain other compensation. Defendants further promised to maintain the confidentiality of the invention and Confidential Information and to refrain using the invention and the Confidential Information for commercial purposes unless Neev consented to their use.

34.    Neev relied, to his detriment, upon Defendants' promises.

COMPLAINT

35.    Defendants have not fulfilled their promises. Due to his reliance on Defendants' promises and Defendants' failure to fulfill them, Neev has been damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

## ACCOUNTING

### (Against Defendants DermaCare and Therative)

36.    Plaintiff repeats and re-alleges each and every allegations of paragraphs 1 through 11 to the extent such allegations are consistent with this cause of action as though fully set forth herein. Plaintiff does not intend to incorporate any allegation that contradicts the allegations contained in this cause of action, and any contradictory allegations are not incorporated herein. This cause of action is pleaded in the alternative.

37.    Defendants have misused and misappropriated Neev's invention and Confidential Information. Neev is entitled to an accounting and disgorgement of all profits and benefits Defendants have gained thereby.

## PRAYER

WHEREFORE, Plaintiff prays for an order of the Court:

1.    Enjoining Defendants and their agents, employees, and those acting in concert with them, during the pendency of this action and permanently thereafter from appropriating and using the invention and Confidential Information;

2.    Requiring Defendants to pay to Neev all damages suffered by Neev due to their unlawful acts, with prejudgment interest, as well as account

COMPLAINT

for and pay to Neev all gains and profits that they have enjoyed at Neev's expense and that such damages include Neev's costs and attorney's fees;

3.      Directing Defendants to account to Plaintiff for any and all profits and benefits derived by Defendants from the sale of goods or services derived from the invention or Confidential Information and to disgorge such profits and benefits;

4.      Awarding Neev a monetary judgment against Defendants for Plaintiff's incidental and consequential damages;

5.      Awarding Neev a monetary judgment against Defendants for Plaintiff's punitive damages;

6.      Trebling the amount of such award on account of Defendant's willful misappropriation of trade secrets;

7.      Awarding Plaintiff its attorney's fees; and

8.      Awarding Plaintiff such other and further relief as the Court may deem just and proper.

Date: April 1, 2008               TEUTON, LOEWY & PARKER LLP
                               KENNETH G. PARKER

                               By
                                Kenneth G. Parker
                                Attorneys for Plaintiff
                                JOSEPH NEEV

COMPLAINT

ALTERNATIVE DISPUTE RESOLUTION
INFORMATION PACKAGE
Effective April 15, 2005

Instructions to Plaintiff / Cross-Complainant

> In all general civil cases filed in the trial courts after June 30, 2001, the plaintiff
> is required to serve a copy of this ADR information package on each defendant.

California Rules of Court, Rule 201.9 (Excerpt)

(a) Each court must make available to the plaintiff, at the time of filing of the
complaint, an Alternative Dispute Resolution (ADR) information package that
includes, at a minimum, all of the following:

(1) General information about the potential advantages and disadvantages
of ADR and descriptions of the principal ADR processes . . .

(2) Information about the ADR programs available in that court . . .

(3) In counties that are participating in the Dispute Resolution Programs
Act (DRPA), information about the availability of local dispute resolution
programs funded under the DRPA . . .

(4) An ADR stipulation form that parties may use to stipulate to the use
of an ADR process.

(b) Court may make package available on Web site . . .

**(c) The plaintiff must serve a copy of the ADR information package on
each defendant along with the complaint. Cross-complainants must serve a
copy of the ADR information package on any new parties to the action
along with the cross-complaint.**

Rev 4/05

# GENERAL INFORMATION ABOUT ADR

## Introduction to Alternative Dispute Resolution

Did you know that most civil lawsuits settle without a trial? And did you know that there are a number of ways to resolve civil disputes without having to sue somebody? These alternatives to a lawsuit are known as alternative dispute resolution (also called ADR). The most common forms of ADR are mediation, arbitration, and neutral evaluation. There are a number of other kinds of ADR as well.

In ADR, trained, impartial persons decide disputes or help parties decide disputes themselves. These persons are called neutrals. In mediation, for example, the neutral is the mediator. Neutrals normally are chosen by the disputing parties or by the court. Neutrals can help parties resolve disputes without having to go to court.

ADR is not new. ADR is available in many communities through court-connected and community dispute resolution programs and private neutrals.

## Advantages of Alternative Dispute Resolution

ADR can have a number of advantages over a lawsuit:

- ADR can be speedier. A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.

- ADR can save money. Court costs, attorney fees, and expert witness fees can be saved.

- ADR can permit more participation. With ADR, the parties may have more chances to tell their side of the story than in court and may have more control over the outcome.

- ADR can be flexible. The parties can choose the ADR process that is best for them.

- ADR can be cooperative. In mediation, for example, the parties having a dispute may work together with the neutral to resolve the dispute and agree to a remedy that makes sense to them, rather than work against each other.

- ADR can reduce stress. There are fewer, if any, court appearances. And because ADR can be speedier, cheaper, and can create an atmosphere in which the parties are normally cooperative, ADR is easier on the nerves. The parties don't have a lawsuit hanging over their heads. For all the above reasons, many people have reported a high degree of satisfaction with ADR.

Because of these advantages, many parties choose ADR to resolve a dispute instead of filing a lawsuit. Even when a lawsuit has been filed, ADR can be used before the parties' positions harden and the lawsuit becomes costly. ADR has been used to resolve disputes even after a trial, when the result is appealed.

## Disadvantages of Alternative Dispute Resolution

ADR may not be suitable for every dispute.

If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.

There generally is less opportunity to find out about the other side's case with ADR than with litigation. ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

The neutral may charge a fee for his or her services.

If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

Lawsuits must be brought within specified periods of time, known as statutes of limitations. Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.

## Three Common Types of Alternative Dispute Resolution

This section describes the forms of ADR most often found in the California state courts and discusses when each may be right for a dispute.

### Mediation

In mediation, a neutral (the mediator) assists the parties in reaching a mutually acceptable resolution of their dispute. Unlike lawsuits or some other types of ADR, the mediator does not decide how the dispute is to be resolved. The parties do.

Mediation is a cooperative process in which the parties work together toward a resolution that tries to meet everyone's interests, instead of working against each other where at least one party loses. Mediation normally leads to better relations between the parties and to resolutions that hold up. For example, mediation has been very successful in family disputes, particularly with child custody and visitation.

Mediation is particularly effective when the parties have a continuing relationship, like neighbors or business people. Mediation also is very effective where personal feelings are getting in the way of a resolution. This is because mediation normally gives the parties a chance to let out their feelings and find out how they each see things.

Mediation may not be a good idea when one party is unwilling to discuss a resolution or when one party has been a victim of the other or has unequal bargaining power in the mediation. However, mediation can be successful for victims seeking restitution from offenders. A mediator can meet with the parties separately when there has been violence between them.

### Arbitration

In arbitration, a neutral (the arbitrator) reviews evidence, hears arguments, and makes a decision (award) to resolve the dispute. Arbitration normally is more informal and much speedier and less expensive than a lawsuit. Often a case that may take a week to try in court can be heard by an arbitrator in a matter of hours, because evidence can be submitted by documents (like medical reports and bills and business records) rather than by testimony.

There are two kinds of arbitration in California: (1) Private arbitration, by agreement of the parties involved in the dispute, takes place outside of the courts and is normally binding. In most cases "binding" means that the arbitrator's decision (award) is final and there will not be a trial or an appeal of that decision. (2) "Judicial arbitration" takes place within the court process and is not binding unless the parties agree at the outset to be bound. A party to this kind of arbitration who does not like a judicial arbitration award may file a request for trial with the court within a specified time. However, if that party does not do better in the trial than in arbitration, he or she may have to pay a penalty.

Arbitration is best for cases where the parties want a decision without the expense of a trial. Arbitration may be better than mediation when the parties have no relationship except for the dispute.

Arbitration may not be a good idea when the parties want to decide on the outcome of their dispute themselves.

### Neutral Evaluation

In evaluation, a neutral (the evaluator) gives an opinion on the strengths and weaknesses of each party's evidence and arguments and makes an evaluation of the case. Each party gets a chance to present his or her side and hear the other side. This may lead to a settlement or at least help the parties prepare to resolve the dispute later on. If the neutral evaluation does not resolve the dispute, the parties may go to court or try another form of ADR.

Neutral evaluation, like mediation, can come early in the dispute and save time and money.

Neutral evaluation is most effective when a party has an unrealistic view of the dispute, when the only real issue is what the case is worth, or when there are technical or scientific questions to be worked out.

Neutral evaluation may not be a good idea when it is too soon to tell what the case is worth or if the dispute is about something besides money, like a neighbor playing loud music late at night.

## Other Types of Alternative Dispute Resolution

There are several other types of ADR besides mediation, arbitration, and neutral evaluation. Some of these are conciliation, settlement conferences, fact-finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR methods. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute.

The selection of a neutral is an important decision. There is no legal requirement that the neutral be licensed or hold any particular certificate. However, some programs have established qualification requirements for neutrals. You may wish to inquire about the qualifications of any neutral you are considering.

Agreements reached through ADR normally are put in writing by the neutral and, if the parties wish, may become binding contracts that can be enforced by a judge.

You may wish to seek the advice of an attorney about your legal rights and other matters relating to the dispute.

## Help Finding an Alternative Dispute Resolution Provider in Your Community

To locate a dispute resolution program or private neutral in your community:

- Visit the Court's Web site. The Alameda County Superior Court maintains a list of court-connected mediators, neutral evaluators, and private arbitrators at http://www.co.alameda.ca.us/courts/adr.htm.

- Contact the Small Claims Court Legal Advisor. The small claims legal advisor for Alameda County is located at the Wiley W. Manuel Courthouse, Self-Help Center. The phone number is 510-268-7665.

- Visit the California Department of Consumer Affairs' Web site. The Department of Consumer Affairs (also called the DCA) has posted a list of conflict resolution programs throughout the state. The list can be found at http://www.dca.ca.gov/r_r/mediat1.htm

  You can also call the Department of Consumer Affairs, Consumer Information Center, at 800-952-5210.

- Contact your local bar association. You can find a list of local bar associations in California on the State Bar Web site at http://www.calbar.org/2lin/2bar.htm.

  If you cannot find a bar association for your area on the State Bar Web site, check the yellow pages of your telephone book under "Associations."

- Look in the yellow pages of your telephone book under "Arbitrators" or "Mediators."

- Automotive Repair, Smog Check: The California Bureau of Automotive Repair (also known as BAR) offers a free mediation service for consumers who are dissatisfied with an auto repair or a smog check, or who dispute an invoice for such services. BAR registers and regulates California automotive repair facilities and licenses smog, lamp, and brake inspection stations. Learn more at http://smogcheck.ca.gov/smogweb/geninfo/otherinfo/mediation.htm or call 800-952-5210.

- Attorney Fees: The State Bar of California administers a mandatory fee arbitration program to resolve attorney fee disputes between lawyers and their clients. The program is an informal, low-cost forum and is mandatory for a lawyer if a client requests it. Mediation of attorney fees disputes may also be available in some areas of California. Learn more at http://www.calbar.org/2bar/3arb/3arbndx.htm or call 415-538-2020.

## DISPUTE RESOLUTION PROGRAMS IN ALAMEDA COUNTY

**Mediation Services**
22278 Redwood Road, Castro Valley, CA 94546
Phone: (510) 733-4940   fax: (510) 733-4945
Provides a panel of mediators to assist in the process of reaching an agreement in the areas of Neighborhood Disputes,
Child Custody, Divorce, Parent/Teel Conflicts, Home Owners Association, Business, Real Estate, Employer/Employee,
and Fremont Rent Increases.

**East Bay Community Mediation**
1968 San Pablo Avenue, Berkeley, CA 94702-1612
Phone: (510) 548-2377   fax: (510) 548-4051
EBCM is a community-based mediation program created by the union of Berkeley Dispute Resolution Service and
Conciliation Forums of Oakland. EBCM offers counseling on options and approaches to resolving a dispute, mediation,
large-group conflict facilitation, and conflict resolution skills workshops.

**Catholic Charities of the East Bay: Oakland – Main Office**
433 Jefferson Street, Oakland, CA 94607
Phone: (510) 768-3100  fax: (510) 451-6998
Mediators are responsible for mediation sessions involving the youth, victim and family members to work towards a
mutually agreeable restitution agreement. Also provide free workshops in anger management and mediation.

**Center for Community Dispute Settlement**
1789 Barcelona Street, Livermore, CA 94550
Phone: (925) 373-1035
Provides services in Tri-Valley for all of Alameda County. Program goals are to increase the number of court cases
resolved, mediating small claims cases four days per week, and training youth in listening and conflict resolution skills.

**California Lawyers for the Arts: Oakland Office**
1212 Broadway Street, Suite 837, Oakland, CA 94612
Phone: (510) 444-6351  fax: (510) 444-6352
This program increases the resolution of arts related disputes such as artistic control, ownership of intellectual property,
credit for work performed or produced and contract issues, through the use of alternative dispute resolution. It also
increases the capacity to provide services for counseling, conciliation and administration of mediation, arbitration and
meeting facilitation.

Rev 9/05

ALAMEDA COUNTY SUPERIOR COURT
ADR PROGRAM

### ADR Program Administrator

Pursuant to California Rule of Court 1580.3, the presiding judge of the Superior Court of California, County of Alameda has designated Benjamin D. Stough, Berkeley Trial Court Administrator, to serve as ADR program administrator.

A Plaintiff may elect, the parties may stipulate or a judge may refer a case to Judicial Arbitration. The Judicial Arbitration Program Coordinator may be contacted at (510) 670-6646.

### The Judicial Arbitration Process

#### Appointment of Arbitrator (must be appointed within 30 days after referral per CRC 1605).
⇒ Parties mailed list of five names from which to select. (List mailed within 5-10 business days after receipt of referral).

⇒ Each party may reject one of the names listed (10 calendar days per CRC 1605a)

⇒ The administrator randomly appoints the arbitrators from the names remaining on the list. If only one remains then is deemed appointed.

#### Assignment of Case (CRC 1605(4))
⇒ Within 15 days of notice of the appointment, the arbitrator shall contact parties in writing about time, date, and place of the hearing. The parties shall receive at least 30 days notice prior to the hearing.

#### Hearings (CRC 1611)·
⇒ Shall be scheduled so as to be completed not less than 35 days nor more than 90 days from the date the arbitrator was assigned. For good cause shown, the case may be continued an additional 90 days by the Case Management Judge.

#### Award of Arbitrator (CRC 1615b & c)
⇒ Arbitrator must file an award within 10 days after conclusion of the arbitration hearing. The court may allow 20 additional days upon application of arbitrator is cases of unusual length or complexity.

⇒ Within 30 days of the filing of the award the parties may file a Request for Trial de Novo. The clerk shall enter the award as a judgment after 30 days provided a Trial de Novo has not been filed.

#### Return of Case to Court
⇒ Upon Filing of Trial de Novo the action is returned to Case Management Judge for further proceedings. (CRC 1616 & Local Rule 6.4)

⇒ If Trial de Novo is not filed then judgment is entered and the Case Management Judge is notified (CRC 1615c & Local Rule 6.6)

⇒ If parties indicate a settlement then case is returned to Case Management Judge and case is continued 45 days for an Order to Show Cause RE filing a dismissal. (Local Rule 6.6)

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

| | | |
|---|---|---|
| Allen E. Broussard Justice Center<br>600 Washington Street, Oakland, CA 94707 | Berkeley Courthouse<br>2000 Center Street, 2~ Fl., Berkeley, CA 94704 | George E. McDonald Hall of Justice<br>2233 Shoreline Drive, Alameda, CA 94501 |
| Fremont Hall of Justice<br>39439 Paseo Padre Parkway, Fremont, CA 94538 | Gale/Schenone Hall of Justice<br>5672 Stoneridge Drive, Pleasanton, CA 94588 | Wiley W. Manuel Courthouse<br>661 Washington Street, Oakland, CA 94607 |
| Hayward Hall of Justice<br>24405 Amador Street, Hayward, CA 94544 | René C. Davidson Courthouse<br>1225 Fallon Street, Oakland, CA 94612 | |

Case No.: _____

_____
Plaintiff

vs.

**STIPULATION FOR ALTERNATIVE
DISPUTE RESOLUTION (ADR)**

_____
Defendant

The parties by and through their attorneys of record hereby stipulate to submit the within

controversy to the following Alternative Dispute Resolution process:

_____

_____

_____

### ORDER

The foregoing stipulation having been read and considered, and good cause appearing, now therefore,

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the matter be set for Order to Show Cause Hearing RE:

Dismissal on _____ at _____ a.m./p.m. in Department _____

Dated: _____

_____
JUDGE OF THE SUPERIOR COURT

(SEAL)

Rev 4/05

**EXHIBIT B**

1    KENNETH G. PARKER (SBN 182911)
         kparker@tlpfirm.com
2    ROBERT G. LOEWY (SBN 179868)
         rloewy@tlpfirm.com
3    TEUTON, LOEWY & PARKER LLP
      3121 Michelson Drive, Suite 250
4    Irvine, California 92612
      Telephone: (949) 442-7100
5    Facsimile: (949) 442-7105

6    Attorneys for Plaintiff
      JOSEPH NEEV
7

8                SUPERIOR COURT FOR THE STATE OF CALIFORNIA

9                     COUNTY OF ALAMEDA, COMPLEX DIVISION

10

11   JOSEPH NEEV,                          ) **Case No.: RG08379458**
                                           )
12              Plaintiff,                  )
                                           )
13        v.                               ) **FIRST AMENDED COMPLAINT**
                                           ) **FOR:**
14   DOES 1-100; GEORGE CHOI, an           )
      individual; LUIZ DASILVA, an         ) (1) CONVERSION;
15   individual; THERATIVE, INC., a        ) (2) MISAPPROPRIATION OF TRADE
      Delaware corporation; DERMACARE,     ) SECRETS;
16   INC., a Delaware corporation,         ) (3) BREACH OF IMPLIED
                                           ) CONTRACT;
17              Defendants.                 ) (4) QUANTUM MERUIT;
                                           ) (5) PROMISSORY ESTOPPEL;
18                                         ) (6) FRAUD;
                                           ) (7) PROMISSORY FRAUD; AND
19                                         ) (8) ACCOUNTING
                                           )
20   _____ )

21                                              BY FAX

22

23

24

25

26

27

28

─────────────────────────────────────────────
                    FIRST AMENDED COMPLAINT

1    Plaintiff Joseph Neev files this First Amended Complaint against Defendants as
2   set forth more fully below.

3

4                           **JURISDICTION AND VENUE**

5        1.    Venue of this action in this Court is proper because at least one of the
6   defendants resides in this jurisdiction.

7

8                                   **PARTIES**

9        2.    Mr. Neev is an individual residing in Orange County, California.

10

11       3.    Plaintiff is informed and believes that Defendant Luiz DaSilva
12   "DaSilva" is an individual who resides in California.

13

14       4.    Plaintiff is informed and believes that Defendant George Choi "Choi"
15   is an individual who resides in California.

16

17       5.    Mr. Neev is informed and believes that Defendant Therative, Inc.
18   ("Therative") is a corporation incorporated under the laws of the State of Delaware
19   and that is headquartered in the County of Alameda at 6248 Preston Avenue,
20   Livermore, California 94551.  Plaintiff is informed and believes that Therative is the
21   successor-in-interest of DermaCare, Inc.

22

23       6.    Mr. Neev is informed and believes that Defendant DermaCare, Inc. is a
24   Delaware corporation that is the predecessor-in-interest of Therative.  DermaCare,
25   Inc. is not a corporation in good standing in the State of California.  Plaintiff is
26   informed and believes that DermaCare was and is headquartered in the County of
27   Alameda at the same address as Therative.

28

FIRST AMENDED COMPLAINT

7.     Defendants DOES 1 through 100, inclusive, are sued herein under fictitious names.  Their true names and capacities, whether individual, corporate, associate or otherwise, are unknown to Mr. Neev.  When their true names and capacities are ascertained, Mr. Neev will amend this complaint by inserting their true names and capacities herein.  Mr. Neev is informed and believes and thereon alleges that each of the fictitiously-named Defendants is responsible in some manner for the occurrences herein alleged, and that Mr. Neev's damages were proximately caused by those Defendants.  Each reference in this complaint to "Defendant," "Defendants," or a specifically named defendant refers also to all Defendants sued under fictitious names.

8.     Mr. Neev is informed and believes that at all times mentioned herein Defendants, and each of them, were the agents, principals, employees, servants, partners, joint venturers and representatives of each other.  In doing the acts hereinafter alleged, they were acting within the scope and course of their authority as such agents, principles, employees, servants, partners, joint venturers, and representatives, and were acting with the permission and consent of the other Defendants.  As such, each Defendant is liable for the wrongful acts of the other Defendants.

## FACTS COMMON TO ALL CAUSES OF ACTION

9.     This action arises out of the Defendants' brazen theft of Mr. Neev's inventions.  Mr. Neev holds a Ph.D. in Physics and a Bachelor of Science degree in Engineering Physics.  Mr. Neev has a history of innovation and invention, and is a sole inventor or co-inventor of the inventions that are the subject of the following patents:

- 6,482,199 Method and apparatus for high precision variable rate material, removal and modification

- 6,408,212  Method for treating acne
- 6,402,739  Energy application with cooling
- 6,168,590  Method for permanent hair removal
- 6,156,030  Method and apparatus for high precision variable rate material removal and modification
- 5,720,894  Ultra-short pulse high repetition rate laser system for biological tissue processing
- 7,020,528  Method for treating acne
- 6,717,102  Laser tissue processing for cosmetic and bio-medical applications
- 7,244,253 Energy application with cooling

In addition, Mr. Neev is the inventor of numerous other intellectual property disclosures and inventions, many of which have been the subject of provisional patent applications or invention disclosures to the University of California Office of Technology Transfer. Mr. Neev has also authored or co-authored over seventy articles and five book chapters, chaired or co-chaired many conferences on application of various technologies in biomedicine and dental applications, and is currently the author of a book on ultrashort pulse lasers in biomedical fields.

10.    Mr. Neev is the sole inventor of the invention "Treating Skin Disorders with Thermal Energy," which is the subject of United States Provisional Patent Application Number 60/615,510. (The application shall be described as the "'510 Provisional"; the invention that Plaintiff Mr. Neev conceived of shall be described as the "Invention."). A true and correct copy of the '510 Provisional is attached hereto as Exhibit A.

11.    Mr. Neev filed the '510 Provisional with the United States Patent Office on a confidential basis, and the '510 Provisional and its contents were not

FIRST AMENDED COMPLAINT

1    publicly known when it was filed.  The '510 Provisional disclosed Mr. Neev's

2    invention as including, among other aspects, the following:

> The method utilizes the principle of application of thermal
> energy to the upper layers of the skin such that the skin upper layers
> are forced to expand (fully or differentially) in a manner that result in
> temporary expansion of the pores and pore opening[,] [t]hereby
> treating [a] skin disorder. . . . .
> More specifically, the method and apparatus described herein
> are also applicable for treating skin conditions and skin ailments and
> in particular, acne conditions. . . . The method and apparatus
> described herein[] allows the skin upper layers to temporar[ily]
> expand under the influence of energy deposited into this target
> region[,] thus allowing treatment of the skin disorder[], and in
> particular, acne.

10    ('510 Provisional, Exhibit A, pp. 1-2.)  The '510 Provisional disclosed that "thermal

11    interactions" included "interactions . . . due to conversion of energy into various

12    form[s] of thermal energy or heat."  ('510 Provisional, Exhibit A, p. 31.)  The '510

13    Provisional also specifically disclosed the use of an "electrical source of energy" (as

14    distinguished from an optical source of energy) to generate heat, the use of a

15    "thermo-electric cooler" or "Paltier cooling device" to generate heat, the use of "a

16    thin metal sheet" to deliver heat to the skin, the use of an "electrical heater driven by

17    electrical energy," and the use of a heating surface made of metal.  The '510

18    Provisional further referred to the conversion of electrical energy to heat via the use

19    of electrical resistance.  In addition, the '510 Provisional referred in several

20    instances to a "heat source," and then at other places the '510 Provisional defined

21    various *types* of heat sources, including: (1) optical heat sources such as "flash

22    lamps" and lasers; (2) thermo-electric coolers; (3) electrical sources of energy; (4)

23    an electrical heater driven by electrical energy; and (5) electromagnetic radiation.

24

25         12.    In addition to disclosing the use of electrical energy converted to heat

26    through metal, the '510 Provisional further disclosed the delivery of a "drug or any

27    other substance that is desirable to deliver into the target surface" and the

28    application of the drug or other substance "to the same area of skin before, during,

or after the action" of applying heat. ('510 Provisional, Exhibit A, at p. 15.) Such lotions or potions could include "a lotion for [a]nti-aging or wrinkle treatment, Oil of Ole[], *acne ointment*, nutrients[,] vitamins or any other substance that one may wish to deliver trans-dermally." ('510 Provisional, Exhibit A, at p.20 (emphasis added).) The '510 Provisional also disclosed the application of materials of various temperature ranges for various periods of time to the skin.

13.    Ample evidence of Mr. Neev's conception of the invention prior to the '510 Application exists. For example, laboratory notes and drawings evidence the prior conception. At all times, Mr. Neev kept the Invention confidential and took appropriate steps to maintain its confidentiality.

14.    Mr. Neev knew Defendant DaSilva because, among other reasons, Defendant DaSilva and Mr. Neev were co-inventors of an invention that is the subject of United States Patent No. 5,720,904. Mr. Neev and Defendant DaSilva had worked together, and also knew one another socially.

15.    Mr. Neev disclosed the Invention and the '510 Provisional to Defendant DaSilva in confidence. After DaSilva introduced Mr. Neev to Choi and others, Mr. Neev disclosed the Invention and the '510 Provisional to Defendants Choi and others in confidence. During their initial meeting, Mr. Neev told DaSilva explicitly that he was disclosing the invention to him in confidence and that he was doing so because he knew him and trusted him. Mr. Neev also expressed in his early e-mails to Mr. DaSilva that the information was confidential.

16.    In addition to sharing the Invention and the '510 Provisional with Defendants, prior to Mr. Neev's disclosure and after that disclosure, Mr. Neev shared with Defendants know-how and experience related to the Invention and the

1  `510 Provisional, including the know-how and experience that someone who had
2  spent years considering the Invention and its application, as well as information
3  someone familiar with the art related to the Invention and the `510 Provisional,
4  would possess.  Mr. Neev further shared with Defendants, in confidence, his plans
5  regarding marketing the Invention, including selling the Invention with
6  accompanying treatments.  (Collectively, the know-how, experience, marketing
7  plans and other information Mr. Neev disclosed to Defendants in confidence shall
8  be called the "Confidential Intellectual Capital.").  The `510 Provisional, the
9  Invention and the Confidential Intellectual Capital shall be referred to herein as the
10 "Confidential Information."  Prior to Mr. Neev disclosing the Confidential
11 Information to them, all Defendants agreed not to disclose the Confidential
12 Information to others without Mr. Neev's consent, and agreed not to use the
13 Confidential Information except as consented to by Mr. Neev.  Defendants so
14 agreed to induce Mr. Neev to disclose the Confidential Information to Defendants.
15 The Confidential Information was either not publicly known at all or not readily
16 ascertainable to the general public without the expense of significant time and
17 effort.  In particular, the `510 Application and the Invention were confidential at the
18 time of Mr. Neev's disclosure.

19

20     17.    To induce Mr. Neev to disclose the Confidential Information to
21 Defendants, Defendants represented to Mr. Neev and agreed with Mr. Neev that
22 they would hold all information in confidence and only use it as and if further
23 agreed by Mr. Neev.

24

25     18.    After viewing and reviewing the Confidential Information, Defendants
26 became very excited about the Confidential Information and its prospects for
27 commercial success.  Defendants Choi, Da Silva and certain Doe Defendants
28 proposed that they and Mr. Neev form a corporation to exploit and market the

7

Invention and the Confidential Intellectual Capital. Discussions progressed regarding this business arrangement. During this time, Defendants continued to examine the Invention and utilize the Confidential Intellectual Capital for the benefit of the future corporation the parties were actively discussing. At all times during this process, Defendants represented to Mr. Neev that he, DaSilva and Choi would receive 1/3 interest (with Mr. Neev having 34%) in the corporation and that Mr. Neev would receive a salary and benefits as soon as the first funds are available. Mr. Neev's share would be in exchange for allowing the company to exploit his invention, and Choi's and DaSilva's share would be in exchange for raising funds.

19.    After reviewing Mr. Neev's Confidential Information, DaSilva purported to conceive of a "new" invention, the use of a thin film resistor to generate the heat for the acne treatment device. In essence, what DaSilva suggested (and thought was "new") was the conversion of electricity to heat via the transmission of that electricity through a thin metal strip. The resistance created by the thin metal strip would convert the electrical energy to heat. Upon hearing DaSilva suggest his purportedly "new" idea, Mr. Neev accurately noted that he had already conceived of it. In particular, the '510 Application already referred to the conversion of electricity to heat via metal in many places. Moreover, Mr. Neev already had experience with the use of metal resistance to generate heat. In fact, in a patent application filed in May 2002 and provisional patent applications filed as early as May 2000, Mr. Neev disclosed the use of a pulsed electrical heater in connection with an invention, and also disclosed the use of "high resistance electrical wires" to generate heat. That particular disclosure also described various metals that could be fashioned into "foil," or thin metal, to conduct heat. Thus, DaSilva's alleged, and narrow, conception of a thin metal resistor was not new at all, and in fact was already conceived of by Mr. Neev.

20.    Despite being told that the '510 Provisional already disclosed his invention, DaSilva insisted that he and Mr. Neev file new provisional applications with the United States Patent and Trademark Office. Because Mr. Neev trusted DaSilva, because the parties had, at that time, agreed to form a corporation (DermaCare), and because provisional applications essentially act as "placeholders" until a full application is filed, Mr. Neev acquiesced in the face of DaSilva's insistence. Mr. Neev expected that, in the end, any full application would properly reflect the true inventorship status of the Invention. Mr. Neev reviewed two proposed provisional applications at DaSilva's request. The two provisional applications became Application No. 60/653,740 (the "'740 Application," at true and correct copy of which is attached hereto as Exhibit B) and Application No. 60/634,904 (the "'904 Application," a true and correct copy of which is attached hereto as Exhibit C) (collectively, the "Invalid Applications"). The Invalid Applications do not disclose anything new or innovative. Rather, they disclose information that (a) was already disclosed in the '510 Application, (b) was disclosed by Mr. Neev to Defendants in confidence, (c) could be derived from an examination of the '510 Application and information provided by Mr. Neev and combined with known innovations available to anyone skilled in the art of heating devices.

21.    Unbeknownst to Mr. Neev, DaSilva filed the Invalid Applications with the United States Patent and Trademark Office with a claim that *Defendant Choi*, a former lawyer and investment banker with no background in physics at all, was a co-inventor of the inventions disclosed in the Invalid Applications. The addition of Choi was not known to Mr. Neev at the time DaSilva filed the Invalid Applications and was a fraudulent act by DaSilva and Choi.

22.    Mr. Neev is informed and believes that the filing of the Invalid Applications was a scheme by DaSilva and Choi to attempt to defraud Mr. Neev out

9

1  of his Invention by falsely claiming the conception, by DaSilva and Choi, of

2  elements of a purported new invention that Choi and DaSilva could then exploit on

3  their own to the exclusion of Mr. Neev. Thus, Mr. Neev is informed and believes

4  that Choi and DaSilva plotted to misappropriate and steal Mr. Neev's Confidential

5  Information via filing of the Invalid Applications. Mr. Neev did not discover this

6  plot until well after it occurred.

7

8      23.    After DaSilva filed the Invalid Applications, DaSilva and Choi refused

9  to come to final terms with Mr. Neev regarding ownership and status of the

10  proposed corporation, Defendant DermaCare. In particular, DaSilva and Choi

11  refused to allow Mr. Neev to sit on the board as previously agreed, and refused the

12  stipend that they had previously agreed to.

13

14     24.    After this refusal occurred, Mr. Neev demanded, several times, in

15  writing and verbally, that DaSilva, Choi and DemaCare either: (1) come to amicable

16  terms with Mr. Neev; or (2) cease all use of the Confidential Information and return

17  it to Mr. Neev. These demands were communicated to Defendants in clear and

18  certain terms on more than one occasion. For example, after Defendants began

19  misappropriating the Confidential Information and using it without Mr. Neev's

20  permission, Mr. Neev told DaSilva in writing:

21         I feel very strongly that you and George Choi and DermaCare
       are attempting to misappropriate my proprietary and confidential
22     information and IP that I disclosed to you in confidence assuming that
       you and George Choi will be raising money for the project. A friend
23     would not do these things to a friend, especially that my first words to
       you with respect to my Acne devices ideas back when I met you for
24     the first time in years . . . were: I know you for a long time so I am
       going to trust you and tell you my ideas.
25

26  Mr. Neev further told DaSilva:

27         As you know, I approached you . . . . with my proprietary and
       confidential technology and methods for treating acne and other skin
28     conditions. Without going into too many details, after we met . . . ,
       you and George Choi, told me that you could raise the funds

10

necessary to commercialize my technology and asked me what I wanted in return.   When I got back to you with my offer of giving each of you 30% equity in exchange for your raising the funds for my salary and commercializing the technology, you responded by saying that it was "a very generous offer". . . .

As you know, I disclosed to you technology that described[] photo-thermal, electro-thermal, and other form[s] of energy for treatment of skin conditions, and I very strongly feel that I have ownership over any and all technologies and intellectual properties based on my IP and disclosures to you, George Choi, Peter Scocimara, Heidi and others . . . .

I will be glad to continue discussing the matter with you and DermaCare and consider licensing of my technology to DermaCare, but my equity shares in DermaCare should be similar to those suggested in the proposal . . . sent to you . . . (I believe that, following George Choi term sheet at the time, we proposed 18.66% of DermaCare after the first round of investment).

***Again, if we cannot reach an agreement on licensing terms, no one, including DermaCare, you, George Choi or anyone else affiliated with DermaCare, should utilize my Intellectual Properties or any other confidential information or trade secret that I disclosed to you . . . .***

(Emphasis added.)

Finally, Mr. Neev's attorney informed Choi, DaSilva and Therative (care of National Corporate Research, Ltd.) that absent Mr. Neev's consent and agreement, they were to cease and desist from all use of the Confidential Information:

[I]f you are unable or unwilling to come to some sort of terms with Dr. Neev I want to emphasize that you should not under any circumstance use any component or elements of the technology and you should update any and all potential investors including (but not limited to):
Dr. Debuene Chang
Peter ("Scotch") Scocimara
Heidi Sparks
MedVenture Associates (MVA) (http://www.medven.com)
Investors from Russia Whom You Have Contacted
And any and all other potential investors.
In the event that either of you proceed with development of this technology without Dr. Neev's participation and approval, you will be subject to liability for misappropriation of trade secrets (in the form of the confidential '510 Application, among others), patent infringement when any patents issue, and unfair competition under California law. You may be assured that he will protect these rights.

Mr. Neev is informed and believes that, consistent with their fiduciary duties to Therative and their common law duties of disclosure, Choi and DaSilva passed

1  these communications to all directors, officers, and current and potential investors in
2  Therative.

3

4      25.    Despite Mr. Neev's warnings, Defendants chose to develop, market
5  and sell a device and complementary products that was derived from and embodied
6  the Invention and the Confidential Intellectual Capital (including lotions, a key plan
7  disclosed by Mr. Neev). Indeed, Defendant Therative advertises its ThermaClear
8  device on www.thermaclear.com as follows: "[T]he device delivers a controlled
9  burst of healing thermal energy that reaches deep beneath the surface of your skin,
10  neutralizing the bacteria causing the pimple. This speeds the healing process, so you
11  get CLEARER SKIN FAST--up to four times faster." Having used Mr. Neev's
12  Confidential Information as a spring board, Defendants have successfully marketed
13  and sold their ThermaClear product and enjoyed immense commercial success,
14  including promotional coverage in magazines such as *Elle*, *Redbook*, *Gear Diary*,
15  *New Beauty* and *Shape*. Moreover, the device itself is sold with the complementary
16  "acne ointment" Mr. Neev disclosed in the '510 Application—Clarifying Cleanser
17  and Clearing Gel.

18

19      26.    In sum, Defendants have, without Mr. Neev's consent, used Mr. Neev's
20  Confidential Information for their own profit. Defendants have continued to do
21  even after being repeatedly notified of, and with full knowledge of, Mr. Neev's
22  ownership of the invention and the Confidential Information.

23

24      27.    In addition, Defendants have filed with the United States Patent and
25  Trademark Office full applications that are based on the Invalid Applications.
26  Defendants have further filed an application under the Patent Cooperation Treaty
27  that is based on the Invalid Applications. The three patent applications, however,
28  inappropriately omit Mr. Neev as an inventor and inappropriately include Choi and

DaSilva as inventors. Both errors lead the applications to be fraudulent and invalid. Mr. Neev pleads no cause of action based on this paragraph at this time, but reserves the right to raise this issue in the appropriate forum when the claim related to proper inventorship is ripe.

## FIRST CAUSE OF ACTION

## CONVERSION

### (Against All Defendants)

28.     Plaintiff repeats and re-alleges each and every allegation of paragraphs 1 through 27 as though fully set forth herein.

29.     The Confidential Information was, and is, the property of Mr. Neev.

30.     Defendants have converted the Confidential Information, including the Invention, for their own use and benefit without Mr. Neev's consent or participation. To this very day, Defendants have continued to use the Invention and the Confidential information for their own purposes and benefit.

31.     Defendants' wrongful conversion has damaged Mr. Neev and Defendants have wrongfully benefited from the conversion.

32.     The conduct of Defendants and/or their agents, employees, supervisors as described herein was fraudulent, malicious, oppressive and done with willful and conscious disregard for Plaintiff's rights and for the deleterious consequences of Defendants' actions. Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

## MISAPPROPRIATION OF TRADE SECRETS

### (Against All Defendants)

33.    Plaintiff repeats and re-alleges each and every allegation of paragraphs 1 through 27 as though fully set forth herein.

34.    The Confidential Information and Invention and the know-how and other information that made up the Confidential Information were trade secrets owned by Mr. Neev.  Mr. Neev took reasonable and appropriate steps to protect the information.

35.    Defendants used the trade secrets without Mr. Neev's consent, and Defendants knew or had reason to know that their knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use.  To the extent Mr. Neev initially consented to Defendants' evaluation of the trade secrets, Defendants obtained the consent under false pretenses and the consent was limited.  Moreover, Defendants continued to use the trade secrets long after Mr. Neev withdrew his consent to their use in any form, and in fact continue to use them to this day.

36.    Mr. Neev has been damaged by Defendants' misuse of the trade secrets, and Defendants have been unjustly enriched by their misuse of the trade secrets.  Mr. Neev therefore seeks both actual damages and disgorgement of improperly gained profits, including but not limited to damages due to Defendant's head start in the acne treatment industry by virtue of their improper use of Mr. Neev's Confidential Information and the Invention during a time period when the Invention was not publicly known.

14

37.     The conduct of Defendants and/or their agents, employees, supervisors as described herein was fraudulent, malicious, oppressive and done with willful and conscious disregard for Plaintiff's rights and for the deleterious consequences of Defendants' actions.  Plaintiff is entitled to an award of punitive damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
## BREACH OF IMPLIED CONTRACT
### (Against All Defendants)

38.     Plaintiff repeats and re-alleges each and every allegation of paragraphs 1 through 27 to the extent such allegations are consistent with this cause of action as though fully set forth herein.  Plaintiff does not intend to incorporate any allegation that contradicts the allegations contained in this cause of action, and any contradictory allegations are not incorporated herein.  This cause of action is pleaded in the alternative.

39.     Mr. Neev conveyed valuable ideas and work product to Defendants, in the form of the Confidential Information, who are in the business of considering such ideas and paying for them, and who voluntarily accepted the ideas and work product knowing that they were provided for a price.  The circumstances preceding and attending that disclosure, together with the conduct of Defendants, show that they acted with knowledge of the circumstances, accepted Mr. Neev's ideas and agreed to pay fair value for them.

40.     Defendants' conduct created an implied-in-fact contract between Defendants and Mr. Neev by which Defendants promised to pay Mr. Neev the reasonable value, as established by their later discussions, for Mr. Neev's provision of his ideas, creations, and efforts to Defendants.

41.    Defendants have not paid Mr. Neev.

42.    Due to Defendants' breach, Mr. Neev has been damaged in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
## QUANTUM MERUIT
### (Against All Defendants)

43.    Plaintiff repeats and re-alleges each and every allegation of paragraphs 1 through 27 to the extent such allegations are consistent with this cause of action as though fully set forth herein.  Plaintiff does not intend to incorporate any allegation that contradicts the allegations contained in this cause of action, and any contradictory allegations are not incorporated herein.  This cause of action is pleaded in the alternative.

44.    Mr. Neev provided the invention and Confidential Information to Defendants.  The invention and Confidential Information have value.  Defendants continue to use the invention and Confidential Information for their own benefit, and this constitutes a continual misappropriation of the benefits of Mr. Neev's invention.

45.    In good conscience, Defendants owe Mr. Neev the value of the invention and the Confidential Information and the value derived from use of it.

## FIFTH CAUSE OF ACTION
## PROMISSORY ESTOPPEL
### (Against All Defendants)

46.    Plaintiff repeats and re-alleges each and every allegation of paragraphs

16

1 through 27 to the extent such allegations are consistent with this cause of action as though fully set forth herein. Plaintiff does not intend to incorporate any allegation that contradicts the allegations contained in this cause of action, and any contradictory allegations are not incorporated herein. This cause of action is pleaded in the alternative.

47.     Defendants promised Mr. Neev that if Defendants used the invention and Confidential Information that Mr. Neev would receive a 34% interest in the company to be formed by Defendants for purposes of exploiting and profiting from use of the invention and Confidential Information, as well as certain other compensation. Defendants further promised to maintain the confidentiality of the invention and Confidential Information and to refrain using the invention and the Confidential Information for commercial purposes unless Mr. Neev consented to their use.

48.     Mr. Neev relied, to his detriment, upon Defendants' promises.

49.     Defendants have not fulfilled their promises. Due to his reliance on Defendants' promises and Defendants' failure to fulfill them, Mr. Neev has been damaged in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### FRAUD
### (Against All Defendants)

50.     Plaintiff repeats and re-alleges each and every allegation of paragraphs 1 through 27 to the extent such allegations are consistent with this cause of action as though fully set forth herein. Plaintiff does not intend to incorporate any allegation that contradicts the allegations contained in this cause of action, and any

1  contradictory allegations are not incorporated herein.  This cause of action is
2  pleaded in the alternative.

3

4      51.    Defendants represented to Mr. Neev that filing of the Invalid
5  Applications was for the purposes of enhancing the protection of Mr. Neev's
6  original invention.  In truth, Mr. Neev is informed and believes that Defendants
7  representations were false and that Defendants were conspiring to defraud Mr. Neev
8  out of the Invention and the Confidential Information.

9

10     52.    Mr. Neev relied, to his detriment, upon Defendants' representations.
11

12     53.    Due to his reliance on Defendants' false representations, Mr. Neev has
13  been damaged in an amount to be determined at trial.

14

15     54.    The conduct of Defendants and/or their agents, employees, supervisors
16  as described herein was fraudulent, malicious, oppressive and done with willful and
17  conscious disregard for Plaintiff's rights and for the deleterious consequences of
18  Defendants' actions.  Plaintiff is entitled to an award of punitive damages in an
19  amount to be determined at trial.

20

21

22              **SEVENTH CAUSE OF ACTION**
23                **PROMISSORY FRAUD**
24              **(Against All Defendants)**
25     55.    Plaintiff repeats and re-alleges each and every allegation of paragraphs
26  1 through 27 to the extent such allegations are consistent with this cause of action as
27  though fully set forth herein.  Plaintiff does not intend to incorporate any allegation
28  that contradicts the allegations contained in this cause of action, and any

FIRST AMENDED COMPLAINT

1  contradictory allegations are not incorporated herein.  This cause of action is
2  pleaded in the alternative.

3

4      56.    Defendants promised Mr. Neev that if Defendants used the invention
5  and Confidential Information that Mr. Neev would receive a 34% interest in the
6  company to be formed by Defendants for purposes of exploiting and profiting from
7  use of the invention and Confidential Information, as well as certain other
8  compensation.  Defendants further promised to maintain the confidentiality of the
9  invention and Confidential Information and to refrain from using the invention and
10 the Confidential Information for commercial purposes unless Mr. Neev consented to
11 their use.

12

13     57.    Mr. Neev relied, to his detriment, upon Defendants' promises.
14 Defendants knew that Mr. Neev was relying, to his detriment, upon Defendants'
15 Promises.

16

17     58.    Defendants did not intend to perform the promises when they made
18 them.

19

20     59.    Mr. Neev has been damaged due to Defendants' fraud.

21

22     60.    The conduct of Defendants and/or their agents, employees, supervisors
23 as described herein was fraudulent, malicious, oppressive and done with willful and
24 conscious disregard for Plaintiff's rights and for the deleterious consequences of
25 Defendants' actions.  Plaintiff is entitled to an award of punitive damages in an
26 amount to be determined at trial.

27

28

19

FIRST AMENDED COMPLAINT

## EIGHTH CAUSE OF ACTION

## ACCOUNTING

### (Against Defendants DermaCare and Therative)

61.    Plaintiff repeats and re-alleges each and every allegation of paragraphs 1 through 26 to the extent such allegations are consistent with this cause of action as though fully set forth herein.  Plaintiff does not intend to incorporate any allegation that contradicts the allegations contained in this cause of action, and any contradictory allegations are not incorporated herein.  This cause of action is pleaded in the alternative.

62.    Defendants have misused and misappropriated Mr. Neev's invention and Confidential Information.  Mr. Neev is entitled to an accounting and disgorgement of all profits and benefits Defendants have gained thereby.

### PRAYER

WHEREFORE, Plaintiff prays for an order of the Court:

1.    Enjoining Defendants and their agents, employees, and those acting in concert with them, during the pendency of this action and permanently thereafter from appropriating and using the Invention and Confidential Information;

2.    Requiring Defendants to pay to Mr. Neev all damages suffered by Mr. Neev due to their unlawful acts, with prejudgment interest, as well as account for and pay to Mr. Neev all gains and profits that they have enjoyed at Mr. Neev's expense and that such damages include Mr. Neev's costs and attorney's fees;

FIRST AMENDED COMPLAINT

3.    Directing Defendants to account to Plaintiff for any and all profits and benefits derived by Defendants from the sale of goods or services derived from the Invention or Confidential Information and to disgorge such profits and benefits;

4.    Awarding Mr. Neev a monetary judgment against Defendants for Plaintiff's incidental and consequential damages;

5.    Awarding Mr. Neev a monetary judgment against Defendants for Mr. Neev's punitive damages;

6.    Trebling the amount of such award on account of Defendant's willful misappropriation of trade secrets;

7.    Awarding Mr. Neev attorneys' fees; and

8.    Awarding Mr. Neev such other and further relief as the Court may deem just and proper.

Date: May 6, 2008                     TEUTON, LOEWY & PARKER LLP
                                      KENNETH G. PARKER
                                      ROBERT G. LOEWY


                                      By
                                         Kenneth G. Parker
                                         Attorneys for Plaintiff
                                         JOSEPH NEEV

21

FIRST AMENDED COMPLAINT

# EXHIBIT A

PTO/SB/16 (04-04)
Approved for use through 07/31/2006. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## PROVISIONAL APPLICATION FOR PATENT COVER SHEET

This is a request for filing a PROVISIONAL APPLICATION FOR PATENT under 37 CFR 1.53(c).

Express Mail Label No. **ER 258 904 265 US**

### INVENTOR(S)

| Given Name (first and middle [if any]) | Family Name or Surname | Residence (City and either State or Foreign Country) |
|---|---|---|
| JOSEPH | NEEV | LAGUNA BEACH, CA |

Additional inventors are being named on the _____ separately numbered sheets attached hereto

### TITLE OF THE INVENTION (500 characters max)

### CORRESPONDENCE ADDRESS

Direct all correspondence to:

☐ Customer Number: _____

950 ACAPULCO st.
LAGUNA BEACH
CA. 92651

OR  JOSEPH NEEV

☐ Firm or Individual Name  JOSEPH NEEV

Address  950 ACAPULCO st.

Address

City  LAGUNA BEACH   State  CA   Zip  92651

Country  USA   Telephone 949 499 3961   Fax 949 499 3927

### ENCLOSED APPLICATION PARTS (check all that apply)

☑ Specification  Number of Pages  36    ☐ CD(s), Number _____

☐ Drawing(s)  Number of Sheets  11    ☐ Other (specify) _____

☐ Application Data Sheet. See 37 CFR 1.76

### METHOD OF PAYMENT OF FILING FEES FOR THIS PROVISIONAL APPLICATION FOR PATENT

☒ Applicant claims small entity status. See 37 CFR 1.27.

☒ A check or money order is enclosed to cover the filing fees.

☐ The Director is hereby authorized to charge filing fees or credit any overpayment to Deposit Account Number: _____

☐ Payment by credit card. Form PTO-2038 is attached.

FILING FEE
Amount ($)

$80.00

The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government.

☒ No.

☐ Yes, the name of the U.S. Government agency and the Government contract number are: _____

[Page 1 of 2]

Respectfully submitted,

SIGNATURE  *Joseph Neev*    Date  10/1/04

TYPED or PRINTED NAME  JOSEPH NEEV

TELEPHONE  949 499 3961,  949-295-6594

REGISTRATION NO. _____
(if appropriate)
Docket Number: _____

### USE ONLY FOR FILING A PROVISIONAL APPLICATION FOR PATENT

This collection of information is required by 37 CFR 1.51. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 8 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**PROVISIONAL APPLICATION COVER SHEET**
**Additional Page**

PTO/SB/16 (04-04)
Approved for use through 07/31/2006. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| Docket Number |
|---|

| INVENTOR(S)/APPLICANT(S) | | |
|---|---|---|
| Given Name (first and middle [if any]) | Family or Surname | Residence (City and either State or Foreign Country) |
| | | |

[Page 2 of 2]

Number _____ of _____

WARNING: Information on this form may become public. Credit card information should not be
included on this form. Provide credit card information and authorization on PTO-2038.

# Treating Skin Disorders with Thermal Energy
# Inventor: Joseph Neev

**Abstract:**

Thermal treatments of target material with various thermal interactions are disclosed. A preferred treatment includes Thermal Heat Shuttle that transports a predetermined known quota of energy to the target surface. In particular, thermal quanta launched in lumps of energy leading to the treatment of a variety of skin conditions are disclosed.

## Summary of the invention:

The method utilizes the principle of application of thermal energy to the upper layers of the skin such that the skin upper layers are forced to expand (fully or differentially) in a manner that result in temporary expansion of the pores and pore opening. Thereby treating skin disorder. The method and devices envision thermal energy delivered directly from a source, via the mediation of a heat shuttle, or via the use of electro-optic system such as a laser, or a flash lamp with a topically applied high absorbing substance or a film capable of absorption of such optical energy.

More specifically, the method and apparatus described herein are also applicable for treating skin conditions and skin ailments and in particular, acne conditions. Acne lesions result from the rupture of a sebaceous follicle, followed by inflammation and pus (a "whitehead"), or by accumulation of plugged material in the sebaceous follicle (a

"blackhead"). The creation of this condition requires two elements: (1) plugging of the upper portion of the follicle, and (2) an increase in sebum production. The upper portion of the follicle, i.e., the "pore" into which sebum is secreted and which is directly in contact with the skin surface, is called the infundibulum. A plug forms in the infundibulum from cells, sebum, bacteria, and other debris. The sebaceous gland continues to produce sebum (an oily fluid), stretching the infundibulum until either it or some lower portion of the follicles ruptures. The method and apparatus described herein, allows the skin upper layers to temporary expand under the influence of energy deposited into this target region thus allowing treatment of the skin disordered, and in particular, acne.

## **CLAIMS:**

What is claimed is:

1) A method for treating a target surface comprising the steps of a) Activating a an energy source, b) bringing an energy transporter element into contact with said heat source, c) allowing said energy transporter element to absorb some of the energy from the heat source, d) disconnecting said energy transporter and moving it into contact with target surface, e) allowing a predetermined amount energy from said energy transporter to be transferred to a target surface so that a desired effect is achieved.

2) The method of claim 1 wherein the desired effect is a physical, chemical or biological effect.

2

3)    The method of claim 1 wherein the desired effect is a thermal change in the target surface characteristics.

4)    The method of claim 1 wherein the desired effect is a thermal expansion of the target surface

5)    The method of claim 1 wherein the desired effect is a thermal expansion of the skin

6)    The method of claim 1 wherein the desired effect is a thermal expansion of the skin allowing opening of the skin pores so that said expansion allows at least some enhancement of material transport through said skin pores.

ind

7)    A device for thermal material conditioning comprising

    a.    a heat source elevated to the desired temperature and maintained at said desired temperature.

    b.    A heat shuttle in  contact with the heat source so that thermal energy can diffuse from the heat source and maintain said heat shuttle at the same temperature as the heat source.

    c.    A trigger that allow an operator to willfully released from contact with the heat source and is delivered and brought into contact with the taret

treatment area so that thermal energy can flow from the heat shuttle to the targeted treatment material.

d.    Allowing said heat shuttle to maintain contact with the targeted treatment area of the target material for a period of time sufficient to bring the target material and the heat shuttle into thermal equilibrium so that substantially no heat flow from the heat shuttle to the targeted material.

e.    Removing the heat shuttle from contact with the target surface and bringing it back into a contact with the heat source.

8)    The method of claim 7 wherein the heat shuttle is allowed to maintain contact with the targeted material area for a period of time from about 0.1 microsecond to about 1 second. (2)

9)    The method of claim 7 further comprising of bringing the target material surface to a temperature of between about 45 degrees Celsius and 500 degrees Celsius (3)

10)    The method of claim 7 further comprising of using the human skin as a target material (4)

11)    The method of claim 10 further comprising of bringing the target material surface to a temperature that results in expansion of the skin surface  (5)

4

12) The method of claim 10 further comprising of bringing the target material surface to a temperature that results in effective increase of pore size by at least about 1 micrometer in diameter

13) The method of claim 7 further comprising of repeating all steps at a repetition rate of between about 0.1 Hz and about 1 KHz. And preferably between 0.2 Hz and 10 Hz.

14) The method of claim 7 wherein the heat source is electrical source of energy

15) The method of claim 7 wherein the heat source is a thermo-electric cooler

16) The method of claim 7 wherein the heat shuttle is made of metal

17) The method of claim7 wherein the heat shuttle is made of a thin metal sheet of between about 1 micrometer in thickness and about 10 mm in thickness and preferably between about 70 micrometer and 200 micrometer.

18) The method of claim 7 wherein the target material is skin.

19) **INEPENDENT CLAIM!** – A device for skin conditioning comprising

    a.    a heat source

b. a heat shuttle in contact with said heat source

c. a console to contain both the heat source and the Heat shuttle

d. a transfer compartment capable of separating the heat shuttle from the heat source, and transferring it into contact with the target material, keeping the heat shuttle in contact with said target material for a predetermined period of time, and then removing the heat shuttle from the target material and transferring it back into contact with the heat source.

20) **INEPENDENT CLAIM** A device capable of repeatedly and automatically heating a target material by bringing a Heat Shuttle into high temperature through by keeping the heat shuttle in contact with a heat source,

a. moving the heat shuttle away from the heat source and into contact with a target material to be heated

b. maintaining contact between the heat shuttle and the target material for a predetermined length of time,

c. removing the heat shuttle from the target material and brining it back into contact with the heat source and repeating said steps for a predetermined period of time or a predetermined number of repetitions.

21) The device of claim 20 wherein the target material is the skin

22)    The device of claim 21 wherein the heat shuttle is kept in contact with the skin

target material for a sufficiently long time to allow  expansion of the skin so

that at least one skin pore expands and opens enough to allow enhanced

material transport through said at least one skin pore.

23)    **INEPENDENT CLAIM**  A Device for treating material conditions

comprising,

a.        a heat source,

b.        a heat shuttle in contact with said heat source

c.        said heat shuttle comprises a body capable of loading up evenly with

thermal energy and two latches.

d.        One latch is connected to a spring which tend to propels the heat

shuttle towards the target material and keeps it in contact with said

target material

e.        The second heat latch is picked up (hooked to) by a rotating motor

which propels the heat shuttle back up and brings it back into contact

with the heat source.

f.        The latch is constructed with a slop so that the rotating motor

eventually slips off it allowing the now compressed spring in contstant

contact with latch number one to propel the heat shuttle again into the

target material.

g.        The process is repeated until the operator stops

7

24)    The Device of claim 23 where the role of the spring and the motor is
reversed. I.e. the motor is the one pushing the heat shuttle into the target
material and the spring tends to drive the heat shuttle away from the target
material and into contact with the heat shuttle.

25)    **INEPENDENT CLAIM** A device for material conditioning, (Page 16 of
notebook of **ipen**) comprising,

a.    a magazine full of spring loaded individual heat shuttles (much as in a
automatic machine gun magazine)

b.    said heat shuttle bullets comprise of at least thin aluminum floor to be
loaded with heat energy and two latches

c.    a spring pushing against one latch in order to allow it to create a good
thermal contact with the heat source,

d.    a motor driving against the other latch to push the heat shuttle down
away from the heat source and into contact with the target material

e.    a remover arm pushing the spent heat shuttles (whose thermal energy
was used) away from the device and disposing of them)

f.    A loader arm pushing the "bullets' heat shuttles into place where they
can be picked up by the spring loading mechanism and be pushed into
contact with the heat source.

A motor is used to drive a piston up against a spring (spring loading mechanism). The spring discharge after a stop at the station that allows it to load up with thermal energy. The shuttle is thus propelled by the spring towards the target material to be treated.

The amount of heat energy that was laoded up into the shuttle is finite, so the amount of heat or thermal energy that is discharged into the target material is finite as well.

# Acne Contact device for Home use and Thermal Skin Conditioning for Home use Additional Claims:

I claim:

1)    A method for Material Conditioning comprising of:

   a) A heat source brought to a desired temperature and maintained at that temperature

   b) A Heat Shuttle (HS) maintained at the source temperature through thermal contact with the Heat Source.

c) Means to willfully trigger said heat shuttle (HS) motion so it is released from thermal contact with said heat source and is brought into thermal contact with the targeted treatment area

d) Allowing said heat shuttle to maintain contact with the treatment area for a period of time sufficiently long to transfer sufficient thermal energy to the targeted region to cause thermal expansion of the treated area and bring about the desired effects including the treatment of skin conditions

e) Removing the HS from contact with the targeted area and bringing it back into thermal contact with the heat source

2)    The method of claim 1 further wherein the period of contact between the heat shuttle and the treatment area is from about 0.1 ms to about 1 second and preferably from about 1 ms to about 100ms
(In water-like material such a period of 100ms will allow thermal energy to diffuse to roughly a depth of penetration of about 300um)

3)    The method of claim 1 further comprising of repeating all steps at the repetition rate of between 0.1Hz and 1 KHz and preferably at a repletion rate of between 0.2 Hz and 10 Hz.

10

4)    The method of claim 1 wherein the Heat source is powered by electrical heater driven by electrical energy

5)    The method of claim 1 wherein the heat source is a thermo-electric cooling device (TEC) or Paltrier cooling device

6)    The method of claim 1 wherein the Heat Shuttle (HS) is made of thermally conducting material

7)    The method of claim 1 wherein the Heat Shuttle (HS) is made of metal

7a)    The method of claim 1 wherein the heat shuttle is made of metal of sufficient contact area with the target material to allow reasonable work rate and preferably a contact area with the target material of between about 0.2 cm2 and 4 cm2.

7b)    The method of claim1 wherein the heat shuttle is made of metal of sufficient volume and heat capacity to allow the heat shuttle to carry thermal energy sufficient to raise the temperature of the upper layers of the skin to cause the desired effect and in particular to improve or cure undesired skin conditions.

8)    The method of claim 1 wherein the Heat Shuttle (HS) is made of thermally conducting material in the form of a sheet with a thickness of between about one micrometer and about one millimeter in thickness and preferably between 70 micrometer and 200 micrometer.

11

9)    The method of claim 1 wherein the target material is the skin

10)    The method of claim 1 wherein the target material is the skin and sufficient
thermal energy is delivered by the HS to the targeted skin to cause thermal expansion of
the skin in the treated region and opening of the pores in said skin region to allow
substance to flow in or out of at least a portion of the skin through at least some layers of
the epidermis.

11)    A DEVICE for material conditioning comprising:

   a)  A heat source

   b)  A heat shuttle in contact with said heat source

   c)  A console to contain both the heat source and the heat shuttle (HS) and to ensure
       that neither is in thermal contact with the target treatment area during at least part
       of the device operation time

   d)  A transfer element capable of separating the heat shuttle from the heat source and
       brining it into contact with the target material keeping the heat shuttle, keeping
       the heat shuttle in contact with said target material for a predetermined period of
       time then removing the HS from the targeted material and bringing the HS back
       into thermal contact with the heat source.

12)    A DEVICE for material conditioning capable of repeatedly and automatically heating a target material by heating a heat shuttle (HS) by keeping it in contact with a heat source

Moving said heat shuttle away from the heat source and into contact with the target material

Keeping the HS at the target material for a predetermined period of time

Removing the HS from the target material and bringing it back into contact with the heat source

Repeating said steps at a predetermined repletion rate for a predetermined total operation time period.

13)    The device of claim 12 further comprising keeping the HS in contact with the target material for a sufficiently long time to allow thermal expansion of the target material.

14)    The device of claim 12 wherein the target material is skin and the HS is kept in contact with the skin for a sufficiently long time to allow thermal expansion of the skin and opening of the pores in said skin region to allow substance to

13

flow in or out of at least a portion of the skin through at least some layers of the epidermis.

15) A DEVICE for material conditioning capable of repeatedly and automatically heating a target material by heating a heat shuttle (HS) by keeping it in contact with a heat source and

Moving said heat shuttle away from the heat source and into contact with the target material

Keeping the HS at the target material for a predetermined period of time

Removing the HS from the target material and bringing it back into contact with the heat source

Repeating said steps at a predetermined repletion rate for a predetermined total operation time period.

16) The device of claim 15 further comprising keeping the HS in contact with the target material for a sufficiently long time to allow thermal expansion of the target material.

14

17)   The device of claim 12 wherein the target material is skin and the HS is kept in contact with the skin for a sufficiently long time to allow thermal expansion of the skin and opening of the pores in said skin region to allow substance to flow in or out of at least a portion of the skin through at least some layers of the epidermis.

18)   The device of claim 15 further comprising a pump to lower the pressure within the device chamber and create a tighter seal to the skin. This will allow: better contact with the skin, removal of debris from the skin and pores, and reduction of the amount of air within the chamber in order to minimize heat conduction and heat removal from the HS during it passage from the heat source to the targeted skin.

19)   The device of claim 19 further comprising generating lower pressure through a pump.

20)   The Devices of any of the above claims, wherein said heat shuttle is coated with drug or any other substance that is desirable to deliver into the target surface.

21)   The Device of any of the above claims, wherein a drug or any other substance is applied to the same area of the skin before, during, or after the action of the heat shuttle.

22)    The device of any of the above claims, wherein, a container and dispenser

cotaining and dispensing a drug or any other substance that one wishes to

deliver into the target surface is attached to the heat shuttle apparatus and

delivery a desirable substance before, during or after the action and passage of

the heat shuttle.

# Description of a preferred embodiment:

As **Figure 1** shows, a console 1 contain a heat source 2, and the heat shuttle 3, in contact

with the heat source. The Heat shuttle has latches 4 which allow a motion promoter 8 to

push it towards the skin surface or other target surface 5, and then subsequently to

discharging the its excess heat energy, back towards the heat source, 2. The heat source

contains a source of energy 6, which generate the thermal energy within the heat source.

**Figure 2** shows the position of the heat shuttle with respect to the target material surface

5 and the heat source 2, when in contact with the skin. Note the extended form of the

motion promoters 8.

**Figure 3:** The device of figure 1 and figure 2 can also be envisioned to work

in combination with a dispenser of a drug or nutrient or any other substance that one

desire to deliver into the surface and in particular into the skin. A container 20 carrying

the desired substances can be attached to the device 30 and as the device is moved

forward or backward, as shown by the arrows 40 (forward) and 50 (Backward) dispenser

its substance through the dispenser 60 which is in contact with the target surface and in

particular with the target skin. If the dispenser assembly 20 and 60 precedes the action of the HS device 30 as when the motion is in the direction of the arrow 50, then the HS device 30 acts on the material to drive it into the target surface or skin. However if the dispenser assembly 20 and 60 follows the action of the HS device 30 as when the motion is in the direction of the arrow 40, then the HS device 30 acts on the target material or skin to modify said target surface or skin and enhance the material that is delivered subsequent to the HS device 30 action.

# **Parameters:**

D T = D E/C

Hence

DE = Cskin * DT


C = Cp * Den * Vol

Thus

C = Cp * Den* A *dZ

e.g.

Depth ~ 30 micrometer

D Temp ~ 200 Degrees C

e.g.

Contact time ~ 1 to 10 ms (which is about t dwell time)

17

E.g. Nu = rep rate = 0.2 to 10 Hz.


E.g. Heat source is at about ~ 150 Degree C to about 300 Degree C.


| Diffusion Times | Z | Times |
|---|---|---|
| | 1 um | 1 us |
| | 10 um | 100 us |
| | 100 um | 10 ms |
| | 1 mm | 1 sec |
| | | |


**In another preferred embodiment, laser source (preferably a diode with continous**

**Wave emission power of from about 0.5W to about 10W and preferably with a CW**

**emission power of about 1 W to about 2 W) is focused to a line (e.g. ~1cm long) with**

**a cylindrical lens.**


**A Trigger that releases a hook**

**The Hook holds a mirror that is spring loaded.**

**The spring forces the mirror to move thus moving the line**

**The scanned line makes a rectangle scan of about 1cm X 1cm in area**

**A small electric motor then reloads the spring/mirror to its original position and the**

**hook latches back on**

18

The Trigger also releases TWO other safety shutters:

1. One is an connected to the electrical motor and is designed to flip open /shut a bit slower than the time it take the mirror to do its scan.

2. The second is mechanical and can either be designed to close automatically (e.g., a spring loaded one and its HOOK is designed to release a spring that closes it e.g. 10 ms after the scan begins.

   OR it can be designed to remain open as long as the finger is on the trigger.

The light scans an area that is larger than the opening of the device. The opening of the device is design to allow only the approximately LINEAR and constant velocity of the scanned light through. I.e. the acceleration / deceleration portions are cut out of the opening and DO NOT make it out of the device.

The light scans the surface of a HAS film which we call a "bullet"

The bullet comes out of a magazine loaded with e.g. about 30 bullets.

30 Bullets should be enough to cover an entire face.

The bullets in the magazine are spring loaded and come out with each device trigger action.

Each trigger action also removes the old bullet (e.g. the new bullet pushes the old out) into a disposable collector.

Each bullet may be soaked with a lotion for Anti aging or wrinkle treatment, Oil of Oley, acne ointment, nutrients vitamins or any other substance that one may wish to deliver trans-dermally.

Alternatively, a reservoir of said desired fluids or creams to be delivered trans-dermally into the skin or any other target surface may dispense the desired material either before, during or after the light scanning action.

Figure 5 describes another preferred embodiment of the present invention. Here the device 30 is modified so that the element that motion promoter 8 of the heat shuttle is a motor, preferably an electrical motor. The motor turns it pushes with its bar 200 on the latches 4 which in this case is in the shape of a wedge as shown. As the motor spins, the latch 4 along with the heat shuttle is pushed downward. The latches 4 and the bar are design to be in contact so that the motor pushes all the way to the skin or target surface 5. When contact is made, the bar 200 continues to push again the latches down so that the HS is forced into a good contact with the skin. The bar 200 at that time is just about clearing its contact with the latches 4. The latches 4 are made of somewhat flexible material (e.g. like a hard rubber rod) and as the motor 8 continues to push the bar 200 again the rubber latches 4, the bar slips off the latches wedge and the latches are no longer pushed by the motor 8 and its bar 200. The heat shuttle is spring loaded with a spring 210 as shown, and is thus pulled back all the way up and back into contact with the heating element 2.

20

Simultaneously, the motor also pushes with a symmetrically position bar against another bar shaped like a wedge 220. This bar, however, is connected to a shutter 230, which is pulled out of the way as the heat shuttle getting nearer to the target surface or skin 5. With the same mechanism utilizing the motor 8 rotational motion and the wedge shape of the bar 220, at some point, the bar 220 is released and spring 240 pushes the shutter back to cover the target the surface. The complete clearing of the device 30 opening by the shutter is designed to happen just before the HS is about to make contact with the target surface or skin. As the shutter is pushed back by the spring 240 it may be utilized to push out the bottom portion of the HS 250 which is thus made to be a disposable part utilized only once in each contact. (i.e. a disposable "bullet" in the description above)

Figure 6. Another preferred embodiment of the present invention utilizes the dual push mechanism described by figure 5 to generate an approximately mechanical scan synchronized with the action of a shutter to ensure safety and automated shut off.

A continuous wave laser 300 is activated when the on/off trigger 305 is pushed. The on/off trigger also opens a master shutter 307. The on/off

21

switch also trigger the rotation of a motor 330.  Two bars attached to the motor move parts as follow.

One bar is pushed against the wedge 325 attached to a scanning mirror 320.  The mirror 320 is then moved in the direction of the arrow 335. when the bar 320 slips off the wedge it is pushed back rapidly by a spring 350 that returns it to its original position.  The rotational motion of the motor 330 provides a uniform scan rate for the mirror.

Simultaneously to this motion, the other bar 320, which is attached to the motor 330, is pushed against the wedge 355 to cause a second shutter 360 to be moved at a uniform rate.  The shutter 360 has an opening 370 in it that is moved to allow the laser beam 380 to be moved synchronously with the motion of the scanning mirror to allow the beam through the shutter 360 and into interaction with the target surface or skin 380.  When the bar 320 slips off the ledge 355 the shutter 360 is rapidly pushed back to its close position thus preventing the beam from reaching the target surface or skin 380.

Figure 8 illustrate the device 30 for electro thermal surface treatment (including skin conditions such as acne) wherein the heat shuttle 3 is now a disposable element that is stored in a magazine (or clip) 810 full of additional disposable heat shuttles 3 (like "bullets" stored in a clip).

22

A spring 850 propels the "bullets" heat shuttles 3 towards the heating

element energy source 2 where the bullets 3 are secured and kept in

contact with the heat source through the tension provided by a spring

820.   A motion propeller 8 which can be an electric motor 8, pushes on

the latch 4, and move the heat shuttle away from the heat source and

into contact with the target surface or skin 5.

Once in contact with the target surface or skin 5, the motor arm 860

slips off the heat shuttle handle bar 4 and does no longer forces a

pressure of the heat shuttle 3 on the target surface or skin 5.  At that

time, a removing mechanism consisting of a spring 830 is released and

pushes the used heat shuttle 3 away from the skin as shown by the

arrow 865 and into a disposed heat shuttle collecting pouch, 870.


Figure 9 illustrated the composition and construction of a disposable

heat shuttle 900 as used in figure 8.  The body of the heat shuttle 910 is

made to fit around the heat source.  There are at least one bar or latches

4, which are used to push the heat shuttle 900 against the heat source.

At the bottom of the heat shuttle 900 there is an active element 910 used

for thermal energy storage and capable of contacting both the heat

source for the purpose of uploading thermal energy and, subsequently,

the target surface or skin, for the purpose of conducting its thermal

energy to the target surface or skin and unloading its thermal energy to

the target surface or skin.

**Figure 7.** Yet another preferred embodiment of the present invention pertains to

opto-thermal interaction with a target surface or a skin as shown in figure 7.

Here, the light from the energy source 300  (preferably a laser) impinges on the a
film 407 saturated with a substance of high absorbance in at least one spectral
band of energy radiation 330 coming out of the energy source 420.  The energy
beam 420 then interacts with the film and its energy is converted into thermal
energy that subsequently propagates into the targeted surface or skin 440.  A set
of rollers 470 dispenses a disposable film containing high absorbing substance
film and collects it on the other side.

Alternatively, the film 407 can be made of a pattern of absorber regions and transmitting
regions wherein the absorbers can be made, for example, in a preferred pattern, a pattern
of absorbing dot matrix or absorbing lines and the rest of the film is made of transmitting
material.

**Figure 4.**  Figure 4 illustrate yet another preferred embodiment of the present
invention.  In this embodiment, the energy source 420 is a broadband emitter of energy.
In yet another preferred embodiment, the energy source is a source of electromagnetic
radiation and preferably a broadband electromagnetic radiation with a spectral range from
about 350nm to about 2000 nm and preferably from about 400nm to about 1100nm.
In a modification to this embodiment, the energy source 420 is a flash lamp preferably a
flash lamp with approximately the same characteristics as those of most disposable one-
time use camera on the US market.  In this embodiment, such energy sources are light
source with small flash lamp capable of illuminating a field of up to 20 feet and are
powered by a 1.5-volt batter or two and at least one capacitor and the electronic circuitry
to discharge and recharge it.

In another preferred embodiment the energy source 420 is a broadband emitter of energy.
In yet another preferred embodiment, the energy source is a source of electromagnetic
radiation and preferably a broadband electromagnetic radiation with a spectral range from
about 350nm to about 2000 nm and preferably from about 400nm to about 1100nm.

In yet another preferred embodiment the energy source 420 is a flash lamp preferably a
flash lamp with approximately the same characteristics as those of most disposable one-
time use camera on the US market.  In this embodiment, such energy sources are light
source with small flash lamp capable of illuminating a field of up to 20 feet and are
powered by a 1.5-volt battery (or two 1.5 Volt batteries) and at least one capacitor and the
electronic circuitry to discharge and recharge it.

In a preferred embodiment the high absorbing substance (HAS) film (or a partially
transmitting HAS film is used to convert at least some of the said camera flash energy
into thermal energy. Said film is in contact with the targeted surface or skin and thus is
capable of transferring said converted optical energy from the camera flesh to the film

24

and to the target surface or skin so that a beneficial change to the skin condition or the target surface does occur.

In yet another preferred embodiment said targeted HAS film is made of disposable material either on roller or on removable disposable caps so that it is replaced form energy discharge to the next or from use to use or from time to time. In another preferred embodiment, the flash energy source or the entire assembly is a single use or made to be use only for a few firing of the energy source and then being replaced from time to time.

Here, the light from the energy source 420 (preferably a laser) impinges on the a film (407) saturated with a substance of high absorbance in at least one spectral band of energy radiation 330 coming out of the energy source 420. The energy beam 420 then interacts with the film and its energy is converted into thermal energy that subsequently propagates into the targeted surface or skin 440. A set of rollers 470 dispenses the disposable containing high absorbing substance film and collects it on the other side.

Alternatively, the film 440 can be made of a pattern of absorber regions and transmitting regions wherein the absorbers can be made, for example, in a preferred pattern, a pattern of absorbing dot matrix or absorbing lines and the rest of the film is made of transmitting material.

In another preferred embodiment the energy source 420 is a broadband emitter of energy. In yet another preferred embodiment, the energy source is a source of electromagnetic radiation and preferably a broadband electromagnetic radiation with a spectral range from about 350nm to about 2000 nm and preferably from about 400nm to about 1100nm.

In yet another preferred embodiment the energy source 420 is a flash lamp preferably a flash lamp with approximately the same characteristics as those of most disposable one-time use camera on the US market. In these embodiment, such energy sources are light source with small flash lamp capable of illuminating a field of up to 20 feet and are powered by a 1.5 volt batter or two and at least one capacitor and the electronic circuitry to discharge and recharge it.

In a preferred embodiment the high absorbing substance (HAS) film (or a partially transmitting HAS film is used to convert at least some of the said camera flash energy into thermal energy. Said film is in contact with the targeted surface or skin and thus is capable of transferring said converted optical energy from the camera flesh to the film and to the target surface or skin so that a beneficial change to the skin condition or the target surface does occur.

In yet another preferred embodiment said targeted HAS film is made of disposable material either on roller or on removable disposable caps so that it is replaced form energy discharge to the next or from use to use or from time to time. In another preferred embodiment, the flash energy source or the entire assembly is a single use or made to be use only for a few firing of the energy source and then being replaced from time to time.

**Figure 10.**   Figure 10 shows yet another preferred embodiment. Here, a housing 1005 contain the entire apparatus. An energy source 1010, (For example, can be a 1.5V AA battery or two of them) charges a capacitor 1020. The capacitor discharge allows a flash lamp (or another component capable of generating electromagnetic energy) 1030 to emit electromagnetic energy of known amount of energy and known time duration (these can be easily calculated by a person skilled in the art). The generator of electromagnetic energy or flash lamp is positioned inside a lamp housing 1040. A thermo-optical converter 1050 then absorbs the electromagnetic energy and converts it into heat. The thermo-optical converter 1050 is in contact with the skin 1070 and transmit the thermal energy to the skin. In an alternative preferred embodiment, the thermo-optical converter 1050 is composed of some portion that are fully transmitting of the electromagnetic energy, some portion are partially transmitting and partially absorbing the electromagnetic energy, and some portions of the thermo-optical converter are fully absorbing of said electromagnetic energy or flash lamp energy. The amounts of energy that are fully absorbed, fully transmitted, and partially transmitted and their location on the thermo-optical converter 1050 surface, can be varied according to the desired effect and how much energy is desired at each surface location versus how much energy the user wish to allow to penetrate the surface and heat the surface below.

In another preferred embodiment, multiple flash lamps or Electromagnetic energy generators 1030 (and their related energy sources 1010, and capacitors 1020) are packed into a single housing 1005 to allow the user larger area coverage or increase total energy delivery into a desired treatment area. In another preferred embodiment, said multiple flash lamps or electromagnetic energy generators 1030 are willfully triggered in a desired sequence and multiple times to create a repeated illumination of the same electro thermal converter surface area or a pattern of sequential illumination of different regions within the opto-thermal converter area or a combination of the two.

## BACKGROUND OF THE INVENTION

 Skin disorders, such as acne, can be irritating and embarrassing. The major disease of skin associated with sebaceous follicles, is acne vulgaris. This is also the most common reason for visiting a dermatologist in the United States. There are many treatments, but no cures for acne. These include antibiotics (which inhibit growth of p. acnes bacteria which play a role in acne), retinoids such as Accutane.RTM. (isotetinoin, which reduces sebaceous gland output of sebum), and antimicrobials such as benzoyl peroxide.

Acne lesions result from the rupture of a sebaceous follicle, followed by inflammation and pus (a "whitehead"), or by accumulation of plugged material in the sebaceous follicle (a "blackhead"). This condition has two major requirements: (1) plugging of the upper portion of the follicle, and (2) an increase in sebum production. The upper portion of the follicle, i.e., the "pore" into which sebum is secreted and which is directly in contact with the skin surface, is called the infundibulum. A plug forms in the infundibulum from cells, sebum, bacteria, and other debris. The sebaceous gland continues to produce sebum (an

oily fluid), stretching the infundibulum until either it or some lower portion of the follicles ruptures.

While at any one time only a minority of sebaceous hair follicles on the face and upper back develop acne lesions or other sebaceous gland conditions, the problem of both treatment as well as prevention measures, is knowing which particular gland may be susceptible for such a condition. The method and device conceived by the present invention envision a mild and non-invasive treatment that affect substantial all the hair follicles within the treatment area but result in prevention and treatment only at those sites where the hair follicles are experiencing sebaceous gland conditions or about to experience sebaceous gland conditions while the rest of the hair collicles are not affected adversely by the treatment of the present invention..

In most males, acne is worst in the teenage years and then subsides, in women, teenage acne is often followed by menstrual acne flares well into adulthood. It is well known in the art that both plugging of the infundibulum and high sebaceous gland activity are necessary for an acne lesion to develop. Several methods known in the art are aimed at reducing gland activity or inhibting bacteria. Neev, suggested in a patent applications filed in 1997 that electromagnetic radiation can be used to modify skin pore opening and in particular hair follicles opening to allow enhance drainage or delivery of products into and out of the skin thus allowing treatment and prevention of acne conditions among other treatments and benefits.

In the present invention, I propose to use the concept of thermal energy application to modify the skin or target surface condition to allow modification of the surface for treatment of hair follicles conditions and sebaceous gland conditions. The idea is based on the relative expansion and forced separation of adjacent points on an elastic surface. Just like an expanding balloon, where the relative distance with the expansion of the universe, so does the boundaries of the pores and indeed every point on the expanding skin. Each point on the surface of the balloon is separating and increasing its distance from its neighbor. If one draws a hair follicle opening on such a surface it is clear that said hair follicles opening boundaries are increasing in size with said expansion. Since different material increase at different spatial rate with increase temperature (and increase thermal energy) the result is a disruption in the bond of a plug in the pore opening of the hair follicles and the pore walls occurs. Such result allows dislodging of the plug and enhanced drainage of the unwanted material from inside the surface of the target material or the skin to the outside.

In another preferred embodiment, one may add a substance with high coefficient of thermal expansion to the opening of the pore. One may also try attempt to force such a substance of high thermal expansion coefficient into the target surface opening or skin pores. Such a substance may increase and enhance the relative displacement of the pore opening walls with respect to the plugging material and debris that cause the plugging.

The present invention is based, at least in part, on the discovery that energy can modify skin structure in a reversible way so as to mitigates sebaceous gland caused conditions as well as cure sebaceous gland disorders, e.g., eliminate, inhibit, or prevent occurrence or reoccurrence of the skin disorder. A preferred example of such a sebaceous gland disorder is acne.

Since many undesirable skin conditions result from the blockage of the skin pores, a method for changing the skin pore size and ability to transport fluid was developed using thermal energy. Thermal energy causes material to expand. The exact extent, manner, and amount of expansion is dependent on the parameters of the energy application process. In addition, the extent of the collateral effect (e.g. collateral damage or nature of changes to the skin tissue or target material) is also dependent on parameters of energy application.

In its most general form, continuous application of large amount of energy will cause expansion of the skin or target material but said applied energy will also diffuse into the tissue and may cause unwanted damage to the dermis or deeper lying structure of the target material.

In one preferred embodiment of the current invention, thermal energy is applied substantially to the surface of the material or skin in quanta. Said quanta of energy can be applied by pulses of electromagnetic energy as proposed in my earlier invention (Neev and Neev et al) with our without the help of energy absorbing material such as chromophore or other energy absorbing materials. It can also be brought about via the use energy quanta loaded onto a shuttle that carries that energy from a heat source to the target material or skin

If said energy quanta is unloaded in a rapid manner, (as would be the case for example, when a heated matel body contact the surface of the skin) its excess energy would rapidly flow into the surface of the material and substantially remain their for a duration which is dependent on the thermal conductive nature of the skin or target material.

This action creates a pulsed heating of the skin and has the additional advantage of predetermining the total amount of energy delivered to the skin.

With knowledge of the thermal conductivity of the skin, one can calculate what is the amount of energy that is launched into a predetermined volume and the time-dependent characteristics of such a heating process. In one embodiment of the present invention, we contemplate heating of the upper volume of the skin (for example, from about 5 um depth and down to about 300um from the surface of the skin,) to a temperature of from about 30 degree centigrade and up to about 400 degrees centigrade for duration of up to about 100 ms.

Such a heating range will cause sufficient thermal expansion to allow material to enhanced material flow in and out of the skin pores.

The process can then be repeated by removing the energy transporter form the skin and either reloading it with energy to be delivered to the skin or target material or loading a new transporting element with energy and repeating the process.

Depending on the desired effect, the process can be repeated either in such a way that allow dissipation of the energy that was deposited in the skin by the preceding energy transporter, (i.e. so that the temperature of the skin return to its normal level and all excess energy has been dissipated) or in such a way as to built up in cumulative energy deposition so that beyond the spikes in energy build up there is also average temperature increase in of the upper layers of the skin.

Such cumulative energy built up the associated temperature increase can be useful in, for example, enhancing circulation, stimulating collagen build up, stimulating healing, enhancing activity and penetrating of drugs and substance that have beneficial effects if delivered into the skin, enhancing removal of substances that has bad influences or negative effect on the health or well being of the skin. Such material and sebum removal can be aided by a preceding, simultaneous or following actions of vacuum pumps and suction devices.

Such deposition can be aided by a preceding, simultaneous or subsequent substance delivery action such as ultrasound, electropherosis or any other devices or methods that allow substance to be driven or pushed into the skin.

The energy quanta delivery process has the additional advantage of predetermining the collateral effects and collateral damage of the process or the device. This is the case because if no excess energy is loaded into said energy shuttle no excess damage can occur.

The features and other details of the invention will now be more particularly described and pointed out in the claims. It will be understood that the particular embodiments of the invention are shown by way of illustration and not as limitations of the invention. The principle features of this invention can be employed in various embodiments without departing from the scope of the invention.

The present invention is based, at least in part, on the discovery that thermal energy action can be used to treat sebaceous gland disorders, e.g., eliminate, remove, or prevent occurrence or reoccurrence of the sebaceous gland disorder. Examples of such sebaceous gland disorders include sebaceous gland hyperplasia, acne vulgaris and acne rosacea. A preferred example of such a sebaceous gland disorder is acne.

The present invention also pertains to methods for modifying the opening to the infundibulum by applying thermal energy to the opening to the infundibulum. A sufficient amount of the energy is deposited at the surface of the skin to causes an expansion of the region of the infundibulum, thereby modifying the opening to the infundibulum. In one embodiment, the opening to the infundibulum is altered

such that pore pluggage will not occur, e.g., the infundibulum shape is modified temporarily or permanently such that excess sebum, oils, dirt and bacteria will not cause pore pluggage to occur, resulting in a blackhead (comedon) or white head (milium). In a preferred embodiment, the opening to the infundibulum is opened.

Sebaceous glands are components of the pilosebaceous unit. They are located throughout the body, especially on the face and upper trunk, and produce sebum, a lipid-rich secretion that coats the hair and the epidermal surface. Sebaceous glands are involved in the pathogenesis of several diseases, the most frequent one being acne vulgaris. Acne is a disease characterized by the occlusion of follicles by plugs made out of abnormally shed keratinocytes of the infundibulum (upper portion of the hair follicle) in the setting of excess sebum production by hyperactive sebaceous glands. Various treatment modalities for acne exist that aim in modifying the rate of sebum secretion by the sebaceous glands (e.g., retinoids), inhibiting the bacterial overgrowth in the follicular duct (antibiotics), or decreasing the inflammation of acne lesions (anti-inflammatory agents). Most of these agents are not curative of acne and simply control the disease by affecting one of the aforementioned pathogenic factors. Oral retinoids are a notable exception: they are potent drugs that can achieve a significant cure rate for acne, but their side effect profile often limits their use. Advantages of the present invention include that treatment can permanently or temporarily (and reversibly) alter the pilosebaceous unit, rendering it no longer susceptible to pore pluggage but without the side effects associated with oral retinoids.

The term "sebaceous gland disorders" is intended to include those sebaceous gland disorders which can be treated by the delivery of thermal energy.

Thermal energy quanta can interact with the site of pore pluggage, inflammation, bacteria, viruses, etc. and promote, for example. Examples of sebaceous gland disorders which can be treated by the methods of the invention include sebaceous gland hyperplasia, acne vulgaris and acne rosacea. Of particular importance is treatment of acne by the method of the invention.

The term "pluggage" is intended to obstruction of the pores by the buildup of sebum, dirt, bacteria, mites, oils, and/or cosmetics in the pore, e.g., about the infundibulum.

The term "acne" is recognized but those skilled in the art and is intended to include acne vulgaris and acne rosacea. Acne vulgaris the most common skin disease seen in dermatologic practice which affects approximately 17 million people in the United States. Its precise cause is unknown, although abnormal keratin production with obstruction of the follicular opening, increased production of sebum (lipids secreted by the androgen-sensitive sebaceous glands), proliferation of Propionibacterium acnes (anaerobic follicular diphtheroids),

follicular rupture and follicular mites (demodex) are commonly associated with acne.

Skin conditions such as acne are believed to be caused or exacerbated by excessive sebum flow produced by sebaceous glands most of which are adjacent to and discharge sebum into, hair follicles. Sebum is composed of keratin, fat, wax and cellular debris. Sebum forms a moist, oily, acidic film that is mildly antibacterial and antifungal and may to some extent protect the skin against drying. It is known that the bacteria which contribute to acne, Propionibacterium acnes or (P-acnes), grows in sebum. Significant sebum flow in humans begins at puberty. This is when acne problems generally arise.

The term "thermal interactions" (therapeutic, conditioning, or simulative) is recognized by those skilled in the art and is intended to include interactions, which are due to conversion of energy into various form of thermal energy or heat.  For example, incident electromagnetic energy or light impinging upon a substance capable of absorbing such energy causes the absorbing substance to be energized and the material becomes heated.  Further transmission of the energy to the target material via conduction, convection, or radioactive transfer result in the heating of the target area, preferably selectively with a significant temperature increase of such that unwanted material, e.g., tissues, oils, bacteria, viruses, dirt, etc. are removed.  Preferably, the target heating is such that the surrounding tissue remains unaffected.  The photothermally or thermally targeted material can also form biologically reactive products that further inhibits skin disorder or modify and condition the target material.   Such thermal activation processes can involve oxidation of, for example, cell walls, extra-cellular matrix components, nuclei, etc. As a result of thermal action, the infundibulum can be temporarily or permanently reshaped.  Additionally, the process can cause cell death in the sebaceous gland, thereby decreasing production of sebum.

Thermal alteration of the follicle infundibulum requires the deposition of sufficient energy to cause local heating to temperatures capable to bring about sufficient volumetric changes in the tissue. In general, these temperatures range from about 30 degree C to about 500 degree C. for a range of expansion of the pore opening and preferably from about 50 degree C to about 350 degree C.

 The time duration of the thermal energy deposition which is sufficient to cause thermally induced changes in the blocked region of the follicular opening, can be determined by considering the basic principles of thermal diffusion.  If the thermal energy is delivered within the thermal relaxation time for the target structure, heat flow from the target volume is limited during the thermal delivery time. The preferred thermal delivery time is therefore about equal to or less than the thermal relaxation time of the given target, which measured in seconds is approximately equal to the square of the target's shortest dimension measured in millimeters.

In most skin disorder treatments that involve minimizing the effect to the non-vascular part of the skin (layers without blood vessels or capillary) the interaction should be confined to the epidermis. If we take the epidermal thickness to be on the order of about 100 micrometer, the thermal diffusion time is on the order of about 10 millisecond. The thermal energy delivery phase to the skin should thus be confined to less than about 10 millisecond.

As another example, the infundibulum portion of most sebaceous follicles on the face is approximately 0.3 mm in diameter and the relevant depth is also on the range of about 0.1mm to about 0.4 mm and preferably about 0.2.mm This corresponds approximately to a thermal relaxation time of from about 0.01 seconds to about 0.1 seconds (100 ms).   In practice, the present invention contemplates thermal diffusion into the relevant tissue depth in time duration sufficient to achieve thermo-mechanical expansion of the skin within the heated volume.  The present invention does not contemplate collagen shrinkage as mean for achieving changes in the follicular opening to the skin as in the Anderson patent.

Although thermal confinement can achieved with laser pulse energy, for example pulses shorter than the target's thermal relaxation time, very short pulses cause unwanted mechanical injury, which can rupture the follicles. The fatty acids, sebum, and bacteria present in sebaceous follicles are extremely irritating if not contained by the follicle. In acne vulgaris, rupture of the follicle is an event, which stimulates inflammation to form a "pimple", including accumulation of pus to form a "whitehead". It is therefore desired to avoid rupture of the follicle or sebaceous gland.

The method of the present invention offer a method for avoiding such mechanical injury by allowing the surface of the skin to expand like a membrane or a balloon surface. A weak location at or near the skin surface in the infected area or pimple is the connection of the plug material to the wall of the follicle which. Thus, when the targeted surface is forced to expand, the expansion allows separation of the plug boundaries from the walls of the follicle opening and at least some opening between the follicle walls and the plugging material. This, in turn allows drainage of the infected interior.  The expansion of the follicle opening may allow excess sebum, oils, dirt and bacteria to be expelled so that pore pluggage will not occur, avoiding such conditions as black heads (comedon) or white heads (milium).

Alternatively, a material capable of enhanced absorption of energy may be selectively deposited only at the follicular opening and be caused, after being activated through contact with hot (thermal energy loaded) material, to expand and thermo mechanically push the walls of the opening of the follicle allowing them to expand.  Such thermal energy activated material that expand as a result of contact with the hot item can be, for example, animal fat or any other material

32

that has larger volume expansion coefficient than the skin (or any target surface) itself.

The calculation for a simple model of target material water-based volume expansion and temperature increase are illustrated below.

1)    Energy needed to increase the termperature of a given volume (Volu = AxDepth) to a temperature DT is:

**C = DE/DT ➜ DE= C DT**

```
DE= C DT = c * Ro * Vol *DT
DE = c Ro A*Depth *DT
```

Specific heat capacity water - 4.187 kJ/kgK = C

```
Hence
DE = DT   x 4.2   KJ /(KG*K)
Volume = 10 um X Cm2 = 1E-5 X 1E-4 m3
Volume = 1E-9 m3
Density = Kg/m3
 Mass = M = 1E-9 Kg
= 1E-6 Gram = ug
With DT = 100 C
DE = 4.18 (kJ/Kg) 1E-9Kg/K * 100K = 4.2 E-7 KJ
Hence
```
**DE = 4.2 1E-7 KJ ~ 4 E-4J = 0.4 mJ**

| **Para (DT, Depth=dZ) In water** <br><br> **The area considered in this example is generally about 1 cm2.** | **DE =** <br> **energy needed to raise and area of 1 cm2 and of a depth=dZ, To Temperature DT (mJ)** |
|---|---|
| 100C, 10 um depth 1 cm2 area | 0.4 mJ |
| 100C, 100 um | 4 mj |
| 200C, 10 um | 0.8 mj |
| 200c, 100um | 10 mj |
| 100 C, 200um | 10mj |
| 200 C, 200um | 20 mJ |
| 300 C, 100um | 15 mJ |
| 300 C, 200 um | 30 mJ |

| 300 C, 300 um | 45 mJ |
|---|---|
|  |  |

| Thermal Diffusion distance (um) | Thermal Diffusion time |
|---|---|
| 1 um | 1 us |
| 10um | 100us = ~0.1 ms |
| 30 um | ~ 1 ms |
| 50 um | 2.5 ms |
| 70 um | 5ms |
| 100um | 10ms  10,000 ms |
| 200um | 40 ms |
| 300 um | 90 ms ~ 0.1 SEC |
| 1mm | 1sec |

Diffusion thermal diffusion times vs depth

**C = DE/DT → DE= C DT**

**DE= C DT = c \* Ro \* Vol \*DT**
**DE = c Ro A\*Depth \*DT**

```
Hence
DE = DT  x 4.2  KJ /(KG*K)
Volume = 10 um X Cm2 = 10E-5 X 10-4 m3
Volume = 10-9 m3
Denisty = Kg/m3
 Mass = M = 10E-9 Kg
= 10E -6 Gram
With DT = 100 C

DE = 4.2 10E-7KJ ~ 4 E-4J = 0.4 mJ
```

| Para (Dt, Depth) In water | DE = |
|---|---|
| 100C, 10 um depth 1 cm2 area | 0.4 mJ |

| 100C, 100 um | 4.0 mj |
|---|---|
| 200C, 10 um | 0.8 mj |
| 200c, 100um | 10 mj |
| 100 C, 200um | 10mj |
| 300 C, 100um | 12 mJ |
| | If a one watt laser is used  1 W laser → Then 10 mj we'll get after 10 ms Which is exactly the dwell time. i.e. there is a one to one correspondence between the number of mj to the number of ms dwell times |
| | |
| | |

Heat diffuses relatively slowly in water.
Below is a table showing approximately how long does it take heat to
diffuse to the corresponding depth shown.

| Depth | Time |
|---|---|
| 1 um | 1 us |
| 10um | 100us = ~0.1 ms |
| 30 um | ~ 1 ms |
| 50 um | 2.5 ms |
| 70 um | 5ms |
| 100um | 10ms  10,000 ms |
| 200um | 40 ms |
| 300 um | 90 ms ~ 0.1 SEC |
| 1mm | 1sec |

**Thermal Expansion Calculations:**
**Beta = X 10E-6/ K**
**H2O = 700 (90 C)**
**Jet Fuel 990**
**Mercury 181**

Volume = 10E-9 m3 = 10E+9 um3
DV / V = 700 E-6 * DT
@ 100C
→ DV/V = 0.07
To first approximation:
DV/V ~ 3 DL/L
DA/A~ 2 DL /L

| Delta Temp (DT C)<br>(temp increase) | DV/V (%)<br>Expansion ratio | DL Cubic Root<br>~%<br>% of Linear<br>expansion |
|---|---|---|
| 100 | 7 | 2.3 |
| 200 | 14 | 4.7 |
| 300 | 21% | 7% |
| 400 | 28% | 9.3% |
| 20 | 1.4 | 0.5 |
| 50 | 3.5 | 1.2 |
| | | |

= 7 E-4 * E+9 * 100C = 7 E+7 um3 ~ E8

Thus DL = (E8 um$^3$) $^{1/3}$
DL =  100 um
and AT = 100 C
Del Volume = ~ 7 10 E 7um       →   ~ 10%
Diffusion thermal diffusion times vs depth

**Figure 1:**



BEST AVAILABLE COPY



# Figure 3.



A container containing drug or any other substance for delivery across the surface barrier is pulled behind the Heat Shuttle. Arrow indicated the director of motion.



# Figure 4





FIGURE 5:

Figure 6:

Mead



FIGURE 7



Figure 8

# FiGuRe 9



FIGURE 10:



# Figure 10



## This Page is Inserted by IFW Indexing and Scanning Operations and is not part of the Official Record

## BEST AVAILABLE IMAGES

Defective images within this document are accurate representations of the original documents submitted by the applicant.

Defects in the images include but are not limited to the items checked:

❑ **BLACK BORDERS**

❑ **IMAGE CUT OFF AT TOP, BOTTOM OR SIDES**

☑ **FADED TEXT OR DRAWING**

❑ **BLURRED OR ILLEGIBLE TEXT OR DRAWING**

❑ **SKEWED/SLANTED IMAGES**

☑ **COLOR OR BLACK AND WHITE PHOTOGRAPHS**

❑ **GRAY SCALE DOCUMENTS**

❑ **LINES OR MARKS ON ORIGINAL DOCUMENT**

❑ **REFERENCE(S) OR EXHIBIT(S) SUBMITTED ARE POOR QUALITY**

❑ **OTHER:** _____

## IMAGES ARE BEST AVAILABLE COPY.
## As rescanning these documents will not correct the image problems checked, please do not report these problems to the IFW Image Problem Mailbox.

PATENT APPLICATION SERIAL NO. _____

## U.S. DEPARTMENT OF COMMERCE
## PATENT AND TRADEMARK OFFICE
### FEE RECORD SHEET

10/06/2004 GWORDOF1 00000070 60615510

01 FC:2005                    80.00 OP

PTO-1556
(5/87)

*U.S. Government Printing Office: 2002 — 489-267/69033

# EXHIBIT B

PTO/SB/16 (12-04)
Approved for use through 07/31/2006. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## PROVISIONAL APPLICATION FOR PATENT COVER SHEET
This is a request for filing a PROVISIONAL APPLICATION FOR PATENT under 37 CFR 1.53(c).

Express Mail Label No. EU727315255US

### INVENTOR(S)

| Given Name (first and middle [if any]) | Family Name or Surname | Residence (City and either State or Foreign Country) |
|---|---|---|
| Luiz B. | Da Silva | Danville, CA, USA |
| Joseph | Neev | Laguna Beach, CA, USA |

Additional inventors are being named on the _____ separately numbered sheets attached hereto

### TITLE OF THE INVENTION (500 characters max):

Skin Rejuvenation Device

Direct all correspondence to:    **CORRESPONDENCE ADDRESS**

☐ The address corresponding to Customer Number:

OR

☒ Firm or Individual Name  DermaCare Corporation

Address  6248 Preston Avenue

| City Livermore | State CA | Zip 94551 |
|---|---|---|
| Country USA | Telephone 925-371-3900 | Fax 925-371-3903 |

### ENCLOSED APPLICATION PARTS (check all that apply)

☐ Application Data Sheet. See 37 CFR 1.76           ☐ CD(s), Number of CDs _____
☒ Specification Number of Pages  21                  ☐ Other (specify) _____
☒ Drawing(s) Number of Sheets  18

**Application Size Fee:** If the specification and drawings exceed 100 sheets of paper, the application size fee due is $250 ($125 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s).

### METHOD OF PAYMENT OF FILING FEES AND APPLICATION SIZE FEE FOR THIS PROVISIONAL APPLICATION FOR PATENT

☒ Applicant claims small entity status. See 37 CFR 1.27.
☒ A check or money order is enclosed to cover the filing fee and application size fee (if applicable).    TOTAL FEE AMOUNT ($)  $100.00
☐ Payment by credit card. Form PTO-2038 is attached
☐ The Director is hereby authorized to charge the filing fee and application size fee (if applicable) or credit any overpayment to Deposit Account Number: _____. A duplicative copy of this form is enclosed for fee processing.

The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government.
☒ No.
☐ Yes, the name of the U.S. Government agency and the Government contract number are: _____

SIGNATURE _____                                    Date  2-16-05
TYPED or PRINTED NAME  Luiz B. DaSilva
TELEPHONE  925-371-3900                              REGISTRATION NO. _____
                                                      (if appropriate)  Docket Number  DC-2PROV

### USE ONLY FOR FILING A PROVISIONAL APPLICATION FOR PATENT

This collection of information is required by 37 CFR 1.51. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 8 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

*PROVISIONAL APPLICATION COVER SHEET*
*Additional Page*

PTO/SB/16 (12-04)
Approved for use through 07/31/2006. OMB 0551-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| First Named Inventor | Luiz B. DaSilva | Docket Number | DC-2PROV |
|---|---|---|---|

| INVENTOR(S)/APPLICANT(S) | | |
|---|---|---|
| Given Name (first and middle [if any]) | Family or Surname | Residence (City and either State or Foreign Country) |
| George | Choi | Redwood City, CA. USA |

Number ___1___ of ___1___

WARNING: Information on this form may become public. Credit card information should not be
included on this form. Provide credit card information and authorization on PTO-2038.

PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicant | : Luiz B. Da Silva et al. | Docket No. | : DC-2 PROV |
| Serial No. | : | Art Unit | : |
| Filed | : February 16, 2005 | Examiner | : |
| For | : Skin Rejuvenation Device | | |

**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, VA 22313-1450**

### EXPRESS MAIL CERTIFICATE

"Express Mail" label number:  EU727131525US

Date of Deposit:  February 16, 2005

  I hereby certify that the following *attached*

    1. Provisional Application for Patent Cover Sheet (1 page) (in duplicate);
    2. Provisional Application; (Specification and drawings (39 pages);
    3. Express Mail Certificate;
    4. Return postcard;
    5. Check for $100.00 Filing Fee

is being deposited with the United States Postal Service "Express Mail Post Office to addressee" service under 37 CFR 1.10 on the date indicated above and is addressed to Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

Luiz B. Da Silva
(Type or print name of person mailing paper)


(Signature of person mailing paper or fee)

<u>SKIN REJUVENATION DEVICE</u>

5

<u>BACKGROUND OF THE INVENTION</u>

<u>Field of the Invention</u>

The present invention relates to the fields of skin care.  More particularly, the

10    invention relates to a device and method for treating aging skin and reducing the

appearance of fine lines and wrinkles, increasing skin elasticity, reducing the

appearance of pigmented and vascular lesions, and enhancing the appearance of a

younger looking skin.

<u>Description of Related Art</u>

15    Methods of rejuvenating skin range from the aggressive face lift surgery and

skin resurfacing by lasers (for example, using CO2 lasers) or chemical peel, to the less

effective non-ablative lasers systems, and RF energy skin rejuvenation systems,

microdermabrasion, the use of abrasive devices as well as various lotions and creams.

Additional alternative methods include UV, infrared and light radiation, laser treatment, mechanical abrasion or ultrasound energy. Most of these systems are large and in most cases require professional treatment.

The device described herein utilizes light energy, heat energy, or a
5    combination of the two for selective surface heating that allows the user to achieve temporary pore enlargements for cleaning of the skin pores and expulsion of unwanted debris and undesired substances filling the pores, thus reducing the size of unseemly pores and enhancing the health and appearance of the skin. The method also contemplates thermal energy and light energy deposition into the skin to allow
10    selective injury to the upper layers of the skin and new more elastic collagen production. The device described herein is also designed to allow treatment of the skin more effectively with possibly lower doses of rejuvenating agents. Controlled damage to the epidermis and upper layers of the dermis result in new collagen production and dual action via the use of a combined optothermal heating and enhanced absorption.

15    The present invention is a compact hand held device that can be safely used by adolescents and adults wishing to improve the texture and appearance of their skin and to minimize the appearance of acne, blemished skin, or fine wrinkles.

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide a device and method for treating skin conditions, reducing the appearance of fine lines and wrinkles, and clearing skin from blemishes and pigmented spots.

5          Another object of the present invention is to provide a hand held device that can be used safely to heat a controlled layer of the skin to allow skin rejuvenation and collagen regeneration without collateral damage to adjacent tissue and while enhancing skin condition and appearance.

In one embodiment, the present invention comprises a hand held device with 10          an on/off switch and a button that pulses the device when it is placed on the target site. A battery within the device powers a circuit board and drives a short pulse of current through a thin film resistor. The thin film resistor heats up with sufficient energy to cause skin rejuvenation and induce a biological response improving the appearance of the skin. Typical energy delivery time duration is less than about 0.7 sec. Thermal 15          conduction transfers the heat to the skin and causes a biological response that enhances skin appearance. The total heat energy transferred is low enough to prevent burns, typically less than 50 J/cm$^2$ and for most applications less than 10 J/cm$^2$.

In another embodiment, of the present invention the thin film resistor is replaced with an optical absorbing layer that is heated by flash lamps within the device. 20          The flash lamps are fired by a short discharge, which produces broadband (white) light.

Depending on the desired final temperature of the optical absorbing layer one or multiple flash lamps can be fired simultaneously to combine their light under a single reflector directing the light into the target skin. Alternatively, lamps can be fired in sequence to result in broader longer pulse duration of energy. Again, thermal

5      conduction transfers the heat to the skin and causes a biological response that enlarges pores to enhance product or medicine delivery, clear acne, induce rejuvenation of the skin, and produce new collagen. The total heat transferred is low enough to prevent burns, typically less than 50 J/cm² and for most applications less than 10 J/cm². In this embodiment, the absorbing layer can be designed to allow some light to be transmitted.

10     For example, blue or UV light could be transmitted to interact directly with tissue and kill bacteria directly.

Other objects and advantages of the present invention will become apparent from the following description and accompanying drawings.


15                         BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated into and form part of this disclosure, illustrate embodiments of the invention and together with the description, serve to explain the principles of the invention.

**Figure 1** shows a sectional view taken through the handheld skin treatment

20     device that uses a plurality of flash lamps to deliver energy into the skin.

Figure 2 shows a sectional view taken through the treating head of one embodiment of the skin treatment device, showing one possible way to mount several flash lamps into a single reflector.

Figure 3 shows a sectional view showing the structure of a leaky high absorbing substance (HAS) film.

Figure 4 shows a sectional view taken through another embodiment of the treatment head of the skin-treating device. It shows a possible configuration for construction of multiple treatment windows employing both thermal and optical treatment windows.

Figure 5 shows a sectional view taken through the handheld skin treatment device that uses flash lamps and electrical thin film resistor in a plurality of treatment windows to deliver thermal and optical energy into the skin.

Figure 6 shows a sectional view taken through the human skin showing the main features in the skin structure.

Figure 7 is a table showing approximate thermal diffusion time corresponding to relevant tissue depth in water-like media.

Figure 8 is a table showing the approximate amounts of energy required to bring a water-like media of given volumes to desired temperature levels.

Figure 9 is a table showing the particular energy delivery times of interest.

**Figure 10** is a table showing the percent of thermal expansion that would result from raising the temperature of a water-like material to a given level.

**Figure 11** shows one possible circuit diagram for pulsing the flash lamp or thin film resistor.

5        **Figure 12** shows how the device might be used to treat a blemish on the face.

**Figure 13** shows a possible embodiment of a thin film resistor heater skin treatment unit.

**Figure 14** shows the components driving a thin film skin treatment device.

**Figure 15** is a schematic diagram for the circuit needed to drive the thin film

10      resistor.

**Figure 16** is a simulation of the temperature distribution as a function of distance following an impulse heat pulse from a thermal resistor of the type contemplated by the present invention.

**Figure 17** shows an example of a thin film resistor for use in the device

15      contemplated by the present invention.

**Figure 18** is an example of a thermoelectric cooler (TEC) for use in the device contemplated by the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

The object of the present invention is to provide a device and method for treating skin conditions such as wrinkles, fine lines, skin lesions, and improving the appearance of the skin. Another object of the present invention is to provide a hand held device that can be used safely to treat a thin layer of tissue without undesirable injuries to the skin.

5

Figure 1 illustrates the general configuration of a light-based device for skin rejuvenation. A plurality of flash lamps 15 is placed at the treating end (treatment head) 10 of a handheld device 5. The treatment head delivers a predetermined amount of optical energy. The amount of energy is determined by the discharge energy of a plurality of capacitors 20 powered by an energy source 25 such as a plurality of batteries or any other energy source 25. Control electronics 27 control the amount of energy and operation. Each flash lamp 15 is placed inside a reflector 17 and its optical energy is absorbed and at least partially converted to thermal energy by a film of high absorbing substance (HAS) 23 capable of absorbing said optical radiation.

10

15

In another preferred embodiment illustrated by Figure 1, said flash lamps 15 can be fired sequentially to provide a staggered treatment of different areas in a desired predetermined sequence. In yet another preferred embodiment, a cooling agent is sprayed on between 0.1 ms and 1 second and preferably from about 1ms to about 100 ms after the light is discharge thus allowing heat flow to reach the dermis yet spare the epidermis from damage.

20

Figure 2 shows an alternative embodiment of a skin treatment head 10. In this embodiment, a single reflector 17 encloses a plurality of lamps 15 thus allowing increased energy output from each reflector site 17 in the treatment head 10 of Figure 1. In this example, head/reflector with three lamps.

5          Figure 3 is yet another preferred embodiment where the high absorbing film 23 between the lamps 15 and the skin surface is made of partially transmitting material (for example part of the film layer contain high absorbing substance) 31 to absorb the light of the lamps while other portions of the film 33 allow at least some of the optical energy through to the skin. This configuration will allow part of the light energy to be

10         converted into heat at the skin surface and directly heat the top layers of the skin, while some of the light is allowed to propagate to deeper skin layers where a gradual absorption by skin cells heat up deeper skin tissue. In addition, some of the light that penetrates deeper skin tissue may be preferentially absorbed by skin components (for example blood vessels or pigmentation) that may be targeted for destruction or

15         alteration. The device in this embodiment can, therefore, serve for both skin surface treatment as well as targeting deeper layer skin conditions.

Figure 4 shows yet another preferred embodiment of the present invention. Here the treatment head contains a plurality of treatment windows 42. Some of these consist of a flash lamp and HAS and flash lamp configuration for opto-thermal skin

20         surface modifications (OTSSM), while some 46 contain a flash lamp and a transparent window that allows deeper skin light penetration for direct optical energy light

treatments. The two types of windows **42** can be mounted on a moving mechanism **48** (for example a conveyer belt type mechanism) in an alternating sequence (for example surface optothermal treatment **44** followed by a window of optical energy treatment **46**). While the windows closer to the skin are performing the treatment, the widows

5    further from the skin can be charged for their turn of the treatment. Following the capacitor discharge and the treatment, the moving mechanism **48** can move the treatment windows **42** closest to the skin to the back and those in the back to the front. The treatment can then be repeated while the windows in the back are recharging.

Figure 5 shows another preferred embodiment wherein the plurality of

10    treatment windows **42** can be made of two (**Figure 5B**) or three (**Figure 5A**) windows, and the treatment windows can be made of flash lamp and high absorbing substance ( HAS) combination **52**, a flash lamp/optical energy source, **54**, and a thin film resistor for electro-thermal heating alone **58**. Such a combination could allow, for example, short and rapid surface heating with the flash lamp/HAS combination, deep tissue

15    heating with the flash lamp, and higher temperature longer heating with the thin film resistor.

Figure 6 illustrate the structure of the skin. The main structures are the stratum corneum (a plurality of dead skin cells with a variable degree of adherence to the skin surface). The stratum corneum may vary in thickness but is generally less than

20    20 micrometers in thickness. Below the stratum corneum lies the epidermis which can reach as much as 150 micrometers in thickness depending on the location of the skin on

the human body.  Below the epidermal-dermal junction lies the dermis whose thickness

is in the millimeter range and can vary considerably depending on the location on the

human body.  The epidermis contains among other things, blood vessels, the nerve

ending living cells, sebaceous glands, hair shafts and the roots and matrix of the body

5      hair, sweat glands, and sweat ducts.  Below the epidermis lies a layer of body fat cells.

It is generally accepted today that controlled thermal damage to the upper

layer of the dermis (down to as much as 300 micrometers into the dermal layer) results,

following a healing process, in production of new collagen with both improved

elasticity and tightness.

10     The present invention envisions a plurality of skin improvement effects by

the methods of the present invention:

By depositing a controlled amount of thermal energy at the surface and allowing said

energy to flow into the upper layer of the dermis to achieve controlled damage to the

collagen in the upper dermal layer.  Possibly a cooling element can be activated after a

15     predetermined time of surface heating to remove thermal energy from the surface of the

skin, protect the surface of the skin from a lengthy exposure to thermal energy, and

reverse the flow of thermal energy from deeper lying layers in the dermis back to the

surface.

By temporarily enlarging skin surface pores and allowing cleansing of the pores and causing expulsion of unwanted debris, dirt and contaminants thus resulting in reduced pore size.

By temporarily enlarging skin surface pores thus allowing nutrients, conditioners, and
5    possibly medications to flow into deeper layers of the skin.

By temporarily enlarging skin surface pores and allowing the expulsion of harmful sebum and bacteria thus reducing the chance for the development of acne and other sebaceous gland related ailments.

By thermally damaging the surface layers of the skin followed by flaking and removal
10    of portions of the stratum conium, and portions of the epidermis and dermis.

By thermally damaging vascular or a pigmented component of the skin near the skin surface (in the epidermis or upper dermis). These unwanted damaged components will then be removed by the body as waste products eliminating disfiguring skin blemishes.

Figure 7 shows approximated diffusion times for selected typical distance in
15    water-like media such as human or animal skin. For example, the diffusion of heat to a distance of about 100 micrometers will require approximately 10 milliseconds. These diffusion times ensure that no thermal energy deposited at the surface arrives at deeper skin locations prior to these times. Knowing these approximate diffusion times the present invention contemplates limiting the extent of thermal damage to deeper skin
20    structures by terminating the action of the energy source at the surface and possibly by

introducing a skin surface cooling element subsequent to the thermal energy deposition such that the flow of thermal energy is reversed back to the surface and no thermal energy reaches below a predetermined depth.

**Figure 8** shows the basis for a design of a system for skin conditioning

5        treatment based on the thermal properties of the skin. The right column shows the required energy to bring a volume of the skin with water-like thermal properties to an increase in temperatures (DT) shown in the left column. The calculations assume a skin volume of a centimeter square and depths reaching those shown in the left column.

**Figure 9** shows the particular energy delivery times of interest in the present

10       invention (ranging from about 0.1 ms to as much as about 90 ms) and corresponding to thermal diffusion depths from about 10 micrometers to about 300 micrometers well into the upper layers of the dermis. As can be seen from **Figure 8** and **Figure 9**, the energy density contemplated by the invention is in the range of from about 0.1 J/cm2 to about 50 J/Cm2.

15       **Figure 10** shows the ratio of thermal expansion that would result from raising the temperature of a water-like material by the additional level shown in the left column. It confirms the present inventions assertion that a sufficient volumetric expansion change will result allowing opening of the pores.

**Figure 11** shows one possible circuit diagram to pulse the flash lamp. A

20       switch **200** is turned on to activate the device and charge the capacitor **220**. When the

capacitor is fully charged a lamp **230** (or LED) turns on and the circuit is ready to fire. A push button **250** is pressed to trigger the flash lamp which discharges the capacitor **220**. After firing, the capacitor **220** again begins to charge and after several seconds (depending on battery and resistance) is fully charged. This circuit releases a maximum

5      energy per pulse of ½ $CV^2$ where C is the capacitor capacitance and V is the final voltage across the capacitor. By selecting appropriate values of C and V the released energy can be kept below the threshold for tissue burns.

**Figure 12** shows how the present invention would be used to treat a blemish on the face. The device **10** is activated and then placed in contact with the skin. When

10     in good contact and fully charged, the fire button is pressed to deliver energy to the heating element which then transfer its energy to the skin. The thermal impulse to the skin acts to open pores and accelerate clearing of the blemish.

**Figure 13** shows a possible embodiment of a thin film resistor heater skin treatment unit. A thin film resistor **130** is heated to a predetermined temperature and is

15     brought into contact with the skin targeted for treatment **155**. Within the console, a power source **150** is used to charge a capacitor after a charge button **145** is used to trigger the action. A second button **140** is used to fire the device. A ready light **139** (for example an LED) indicates that the charge cycle is complete and the device is ready to be fired.

20     **Figure 14** shows the components driving the skin treatment device. They include a power source **210**, an electronic control board **220**, a capacitor charged with

the energy needed **230**, a charge/fire button **240**, and an indicator light **250** indicating
that the charge cycle is completed and the unit is ready to be used.

**Figure 15** is a schematic diagram for the circuit needed to drive the thin film
resistor.  A power source **310** (for example a 1.5V battery) voltage is stepped up by a

5      voltage inverter **330** and charges a capacitor **340**.  A switch **320** activates this process.
The capacitor **340** is discharge by a push on the fire switch **360** to heat up the treatment
head heater **350**.

**Figure 16** is a simulation of the temperature distribution as a function of
distance following an impulse heat pulse from a thermal resistor of the type

10     contemplated by the present invention.

**Figure 17** shows an example of a thin film resistor for use in the device
contemplated by the present invention.  It consists of a Teflon back layer **500** and a thin
film heater made of Nichrome **510** which is in contact with the skin.  **Figure 17B** shows
one possible configuration of the thin film Nichrome resistor **510**.  **Figure 17C** shows a

15     side view of the Teflon **500** / Nichrome thin film resistor **510** treatment device
contemplated by the present invention.  It also shows a possible third thin layer of an
insulating material **550** such as a thin paper layer.  The insulating layers serve to absorb
the thermal energy from the thin film resistor and deliver it to the target skin in a
localized manner.  Because of the high conductivity properties of the metal resistor it

20     may discharge its energy rapidly and less uniformly then through the mediation of the
thin insulating layer shown by **550**.

**Figure 18** is an alternative embodiment that uses a Peltier (thermoelectric) cooler to apply heat or cooling to skin. By applying a controlled voltage pulse to the thermoelectric cooler (TEC) the skin can be heated for a selected duration and than

5      cooled when the current is reversed. For example, the TEC hot plate heats up the upper layer of the skin to a temperature of about 50 0C or more for a duration of 0.5 seconds or less, and then the polarity of the TEC is reversed so that the plate in contact with the skin becomes the cooled plate. The temperature of the heated skin surface is quickly dropped so that no damage to the skin surface occurs. In another

10     embodiment, a plurality of TEC with reversible polarities are used in a

As **Figure 18** shows, a power source **1810** is used to drive a TEC **1830** with reversible polarity. For example, the hot plate **1850** can be in contact with the skin while the cooled plate is not in contact with the skin. The TEC is connected to the power source with cords **1820**. The polarity of the TEC can be reversed to allow

15     rapid cooling of the skin surface **1860** by making the plate **1850** the cooled plate, for example, about 0.5 seconds of pulsed heating. In another embodiment a second TEC **1870** can be used to keep the perimeter of the skin treatment area cooled thus preventing collateral damage while the targeted skin surface is treated.

The above descriptions and illustrations are only by way of example and are

20     not to be taken as limiting the invention in any manner. One skilled in the art can substitute known equivalents for the structures and means described. The full scope and definition of the invention, therefore, is set forth in the following claims.

We claim:

1.  A device for treating the skin by delivering a controlled amount of thermal energy to tissue comprising:

a flash lamp with an optothermal absorbing element,

a circuit to deliver a fixed amount of energy to said flash lamp,

a layer capable of absorbing the optical energy discharged by the flash lamp,

means to activate and trigger circuit.

2.  A device for delivering a controlled amount of thermal energy to tissue comprising:

an optical absorbing element with variable transmittance properties,

at least one flash lamp,

a circuit to deliver a fixed amount of energy to said plurality of flash lamps,

means to activate and trigger circuit.

3.  A method for treating skin blemishes comprising:

a trigger circuit to release a pre-determined amount of energy to a plurality of flash lamps,

an absorbing substance capable of absorbing at least some of the light energy and converting it to heat,

heating a predetermined upper layer of the skin to a temperature in excess of about 50 0C.

4.  The method of claim 3 wherein the layer below the epidermal dermal junction remains below 50 0C.

5.  The method of claim 3 wherein the layer below the mid-reticular dermis remain below 50 0C.

6.  The method of claim 3 wherein a cooling element is activated at a predetermined time subsequent to the heating of the skin to remove at least some of the thermal energy from the skin.

7.  A device for delivering a controlled amount of thermal energy to tissue comprising:

    an optical absorbing element with variable transmittance properties,

    at least one  flash lamp,

    at least one electrical heating element

    a circuit to deliver a fixed amount of energy to said plurality of flash lamps, and heating elements,

    means to activate and trigger circuit.

8.  The device of claim 7 wherein an element dispensing substance beneficial to skin conditioning or skin therapy is activated following the treatment allowing delivery of said substance into the skin.

9.  A device for delivering a controlled amount of thermal energy to tissue comprising:

a resistive heating element,

a circuit to deliver a fixed amount of energy to said resistive heating element,

means to activate and trigger circuit.

10.  The device of claim 9 further comprising a thin insulating layer placed between the resistive heating element and the surface of the targeted skin.

11.  A method for treating skin blemishes comprising:

applying a device with an element that can be quickly heated to temperature greater than 50 °C to the skin,

triggering a  circuit to release a fixed amount of energy to the heated element,

allowing heat to conduct into the skin.

12.  The device of claim 10 further comprising a thin insulating layer placed between the resistive heating element and the surface of the targeted skin.

13.  A device for treating the skin comprising:

a thermoelectric cooler,

a circuit to deliver a controlled amount of energy to said thermoelectric cooler,

means to activate and trigger circuit,

directing the hot plate of the thermoelectric cooler to contact with the skin.

14. The device of claim 11, further comprising reversing the polarity of the thermoelectric cooler so that after being heated for a period of time, the hot plate of the thermoelectric cooler becomes the cold plate and is allowed to cool the surface of the skin for a second period of time.

15. The device of claim 11, further comprising a plurality of thermoelectric coolers so that a spatial and temporal heating and cooling configuration is tailored at the targeted skin surface.

16. The device of claim 11 wherein said hot plate heats the surface of the skin to a temperature in excess of about 50 0C for a duration of about 0.5 second or less.

# SKIN REJUVENATION DEVICE

## ABSTRACT OF THE DISCLOSURE

The present invention relates to the fields of skin care. More particularly, the invention relates to a device and method for skin rejuvenation, removing fine wrinkles, and clearing skin. The device comprises an element that can be quickly heated and then transfers a controlled amount of energy to tissue.

# SKIN REJUVENATION DEVICE

Luiz B. Da Silva        (USA)

5        1995 Camino Ramon Place

Danville, CA 94526


Joseph Neev        (USA)

950 Acapulco St.

10        Laguna Beach, CA 9265


George Choi        (USA)

3239 Oak Knoll Drive

Redwood City, CA 94062

15

Figure 1



Figure 2



Top View

Side View

2





Leaky HAS Film



Leaky HAS With
Rotating head –
Light / Opto-
thermal Tx +
Spatial
Averaging

3

Figure 4



**Figure 5**

A



B



Figure 6



Figure 7

| Diffusion Times | Z | Times |
|---|---|---|
| | 1um | 1 us |
| | 10 um | 100 us |
| | 100 µm | 10 ms |
| | 1 mm | 1 sec |
| | | |

Figure 8

| Para (DT, Depth = dZ) In water  The area considered in this example is generally about 1 cm2. | DE =  energy needed to raise and area of 1 cm2 and of a depth=dZ, To Temperature DT (mJ) | Diffusion time (ms) to allow surface energy to reach said depths. |
|---|---|---|
| 100C, 10 um depth | 0.4 J | 0.1 ms |
| 100C, 100 um | 4 J | 10 ms |
| 200C, 10 um | 0.8 J | 0.1 ms |
| 200c, 100um | 10 J | 10 ms |
| 100 C, 200um | 10 J | 40 ms |
| 200 C, 200um | 20 J | 40 ms |
| 300 C, 100um | 15 J | 10 ms |
| 300 C, 200 um | 30 J | 40 ms |
| 300 C, 300 um | 45 J | 90 ms |
| | | |

8

Figure 9

| Thermal Diffusion distance (um) | Thermal Diffusion time |
|---|---|
| 10um | 100us = ~0.1 ms |
| 30 um | ~ 1 ms |
| 50 um | 2.5 ms |
| 70 um | 5ms |
| 100um | 10ms |
| 200um | 40 ms |
| 300 um | 90 ms ~ 0.1 SEC |

Figure 10

Volume = 10E-9 m3 = 10E+9 um3
DV / V = 700 E-6 * DT
@ 100C
→ DV/V = 0.07
To first approximation:
DV/V ~ 3 DL/L
DA/A~ 2 DL /L

| Delta Temp (DT C) (temp increase) | DV/V (%) Expansion ratio | DL/L % of Linear expansion |
|---|---|---|
| 100 | 7 | 2.3 |
| 200 | 14 | 4.7 |
| 300 | 21 | 7 |
| 400 | 28 | 9.3 |
| 20 | 1.4 | 0.5 |
| 50 | 3.5 | 1.2 |

**Figure 11**



**Figure 12**



**Figure 13**



155

130

135 Ready

140 Fire / Charge

150 Power

**Figure 14**



Figure 15



**Figure 16**

## The temperature calculation

Heat-transfer properties for calculation.

| Material | Heat conductivity W/cm/K | Heat capacity J/g/K | Dencity g/cm$^3$ |
|---|---|---|---|
| Skin | 0.00266 | 3.66 | 1 |
| Teflon | 0.0025 | 1. | 2.2 |
| Nichrome | 0.15 | 0.46 | 8.4 |

Step on x into Teflon and into skin $10^{-3}$ cm, into Nichrome $5.10^{-4}$ cm



16

**Figure 17**

**Figure 17A**



**2.1. We produced the heater like the plate in the picture:**

500 Teflon

510 Nichrome

520 Skin ($T_0 = 25^0C$)

**Figure 17B**

10 mm

0.8 mm

510

10 mm

$M = 1:2$

0.35mm

(+)    (−)

510

1 mm, Teflon

500

550

D = 0.1 mm, Nichrome

**Figure 17C**

17

**Figure 18**



PATENT APPLICATION SERIAL NO. _____

## U.S. DEPARTMENT OF COMMERCE
## PATENT AND TRADEMARK OFFICE
## FEE RECORD SHEET

02/22/2005 MGEBREM1 00000039 60653740

01 FC:2005                    100.00 OP

PTO-1556
(5/87)

# EXHIBIT C

EXHIBIT C

20427
121004
U.S. PTO

PTO/SB/16 (12-04)
Approved for use through 07/31/2006. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## PROVISIONAL APPLICATION FOR PATENT COVER SHEET

This is a request for filing a PROVISIONAL APPLICATION FOR PATENT under 37 CFR 1.53(c).

Express Mail Label No. **EU727131566 US**

60/634904
U.S. PTO
20427
121004

### INVENTOR(S)

| Given Name (first and middle (if any)) | Family Name or Surname | Residence (City and either State or Foreign Country) |
|---|---|---|
| Luiz B. | Da Silva | Danville, CA, USA |
| Joseph | Neev | Laguna Beach, CA, USA |

Additional inventors are being named on the ___1___ separately numbered sheets attached hereto

### TITLE OF THE INVENTION (500 characters max):

Skin Treatment Device

### CORRESPONDENCE ADDRESS

Direct all correspondence to:

☐ The address corresponding to Customer Number:

OR

☒ Firm or Individual Name  **Luiz B. Da Silva**

Address  **1995 Camino Ramon Place**

| City **Danville** | State **CA** | Zip **94526** |
|---|---|---|
| Country **USA** | Telephone **925-989-6810** | Fax **925-215-2481** |

### ENCLOSED APPLICATION PARTS (check all that apply)

☐ Application Data Sheet. See 37 CFR 1.76

☒ Specification Number of Pages **13**

☒ Drawing(s) Number of Sheets **7**

☐ CD(s), Number of CDs ————

☐ Other (specify) _____

**Application Size Fee:** If the specification and drawings exceed 100 sheets of paper, the application size fee due is $250 ($125 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s).

### METHOD OF PAYMENT OF FILING FEES AND APPLICATION SIZE FEE FOR THIS PROVISIONAL APPLICATION FOR PATENT

☒ Applicant claims small entity status. See 37 CFR 1.27.

☒ A check or money order is enclosed to cover the filing fee and application size fee (if applicable).

☐ Payment by credit card. Form PTO-2038 is attached

☐ The Director is hereby authorized to charge the filing fee and application size fee (if applicable) or credit any overpayment to Deposit

Account Number: _____. A duplicative copy of this form is enclosed for fee processing.

TOTAL FEE AMOUNT ($)  **$100⁰⁰**

The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government.

☒ No.

☐ Yes, the name of the U.S. Government agency and the Government contract number are: _____

SIGNATURE _____  Date **12-10-04**

TYPED (or PRINTED) NAME **Luiz B. DaSilva**

TELEPHONE **925-989-6810**

REGISTRATION NO. _____
(if appropriate)
Docket Number: **DC-1 PROV**

### USE ONLY FOR FILING A PROVISIONAL APPLICATION FOR PATENT

This collection of information is required by 37 CFR 1.51. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 8 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.
If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

*PROVISIONAL APPLICATION COVER SHEET*
*Additional Page*

PTO/SB/16 (12-04)
Approved for use through 07/31/2006. OMB 0851-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| First Named Inventor | Luiz B. Da Silva | Docket Number | DC-1 PROV |
|---|---|---|---|

| INVENTOR(S)/APPLICANT(S) | | |
|---|---|---|
| Given Name (first and middle [if any]) | Family or Surname | Residence (City and either State or Foreign Country) |
| George | Choi | Redwood City, CA, USA |
| | | |

Number ___1___ of ___1___

**WARNING:** Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.

PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant  :  Luiz B. Da Silva et al.                Docket No.  : DC-1 PROV

Serial No.  :                                        Art Unit    :

Filed      :  December 10, 2004                      Examiner    :

For        :  Skin Treatment Device

**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, VA 22313-1450**

### EXPRESS MAIL CERTIFICATE

"Express Mail" label number:  <u>EU727131556US</u>

Date of Deposit: <u>  December 10, 2004  </u>

     I hereby certify that the following *attached*

       1. Provisional Application for Patent Cover Sheet (1 page) (in duplicate);
       2. Provisional Application;
         (Specification and drawings (20 pages);
       3. Express Mail Certificate;
       4. Return postcard;
       5. Check for $100.00 Filing Fee

is being deposited with the United States Postal Service "Express Mail Post Office to addressee" service under 37 CFR 1.10 on the date indicated above and is addressed to Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

<u>Luiz B. Da Silva</u>
(Type or print name of person mailing paper)

<u>                                        </u>
(Signature of person mailing paper or fee)

# SKIN TREATMENT DEVICE

5

# BACKGROUND OF THE INVENTION

## Field of the Invention

The present invention relates to the fields of skin care.  More particularly, the
10      invention relates to a device and method for treating acne, removing fine wrinkles, and

clearing skin.

## Description of Related Art

Acne affects more than 90% of all adolescents, nearly 50% of all adult women

and 25% of all adults.  One of the main causes of acne is improper drainage of the hair

15      follicle caused by a plug of dead cells or dirt that trap oil and bacteria.  The hair follicle

opening is approximately 50 μm to about 100 μm in diameter.  The opening of any other

pore on the skin is substantially smaller than that.  In particular the opening of the

sweat pores are less than about 30 μm in diameter.

There are a variety of ways to treat acne.  Benzoyl Peroxide  is one of the most

20      commonly used ingredients in over-the-counter treatments, and it can be very effective

in treating mild cases of non-inflammatory acne.  It's safe for children as well as adults, and may be combined with other topical or oral treatments.  For patients who suffer from moderate to severe acne, doctors may prescribe a combination of topical remedies and oral antibiotics. The most common oral medications used to treat acne are

5      tetracycline, minocycline, doxycycline and erythromycin.

Alternatives to medication include UV light radiation, laser treatment, or abrasion.  Most of these systems are large and in most cases require professional treatment.

The present invention is a compact hand held device that can be safely used

10     by adolescents and adults suffering from acne, blemished skin or fine wrinkles.

## SUMMARY OF THE INVENTION

It is an object of the present invention is to provide a device and method for treating acne, removing fine wrinkles, and clearing skin.

15     Another object of the present invention is to provide a hand held device that can be used safely to heat a thin layer of tissue without burns.

These and other objects will be apparent to those skilled in the art based on the teachings herein.

In one embodiment, the present invention comprises a hand held device with

20     an on/off switch and a button that pulses the device when it is placed on the target site.

A battery within the device powers a circuit board and drives a short pulse of current through a thin film resistor. The thin film resistor heats up to approximately 300 °C in less than 0.1 sec. Thermal conduction transfers the heat to the skin and causes a biological response that accelerates acne clearing. The total heat transferred is low

5      enough to prevent burns, typically less than 50 J/cm² and for most applications less than 5 J/cm².

In another embodiment, of the present invention the thin film resistor is replaced with an optical absorbing layer that is heated by flash lamps within the device. The flash lamps are fired by a short discharge which produces broadband (white) light.

10     Depending on the desired final temperature of the optical absorbing layer one or multiple flash lamps can be fired simultaneously. Again, thermal conduction transfers the heat to the skin and causes a biological response that accelerates acne clearing. The total heat transferred is low enough to prevent burns, typically less than 50 J/cm² and for most applications less than 5 J/cm². In this embodiment, the absorbing layer can be

15     designed to allow some light to be transmitted. For example, blue and/or UV light could be transmitted to interact directly with tissue and kill bacteria directly.

In another embodiment, of the present invention the flash lamps are replaced with Ultrabright LED's or laser diodes. The optical absorbing layer is designed to effectively absorb the source spectrum. For a 1 cm² area a minimum of 10 W optical

20     power needs to produced for 0.1 sec.

Other objects and advantages of the present invention will become apparent from the following description and accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated into and form part of
5  this disclosure, illustrate embodiments of the invention and together with the description, serve to explain the principles of the invention.

**Figure 1** shows a sectional view taken through the handheld acne treatment device that uses a thin film resistor to deliver energy into the skin.

**Figure 2** shows a sectional view taken through one embodiment of the
10  heating element, that includes a thick backing layer.

**Figure 3** shows a sectional view taken through another embodiment of the heating element.

**Figure 4** shows a sectional view taken through another embodiment of the heating element.

15  **Figure 5** shows a sectional view taken through the handheld acne treatment device that uses flash lamps and an optical absorber to deliver energy into the skin.

**Figure 6** shows a sectional view taken through one embodiment of the optical absorbing element that includes a thick transparent backing layer, a high conductivity layer and temperature sensor.

Figure 7 shows a sectional view taken through another embodiment of the optical absorbing element.

Figure 8 shows a sectional view taken through another embodiment of the optical absorbing element.

5          Figure 9 shows another embodiment of the handheld acne treatment device that integrates a protective shield.

Figure 10 shows one possible circuit diagram for pulsing the flash lamp (or thin film resistor).

Figure 11 shows how the device might be used to treat a blemish on the face.

10

## DETAILED DESCRIPTION OF THE INVENTION

The object of the present invention is to provide a device and method for treating acne, removing fine wrinkles, and clearing skin. Another object of the present
15      invention is to provide a hand held device that can be used safely to heat a thin layer of tissue without burns.

Figure 1 shows a cross-sectional view of the handheld treatment device 10. The device consists of a battery 20 that powers a circuit board 30. The circuit board 30

is activated with power switch **22** to charge a capacitor that stores enough energy to
heat a thin film resistor **32** to the necessary temperature ( 100 – 400 °C).  The capacitor is
discharged through the resistor **32** when button **24** is pushed.   The circuit will then
recharge the capacitor and be ready to fire again within a few seconds.  In order to

5      reduce the risk of accidental burns the heating element is allowed to cool before another
heating pulse can be fired.  In one embodiment, a temperature sensor (e.g.
thermocouple) **34** monitors the temperature of the heating element and prevents a
heating pulse until the temperature drops below an acceptable temperature (e.g 40 °C).
Suitable thin film resistors can be found at Minco Products, Inc.

10     (http://www.minco.com/ ) (e.g. Thermofoil™ heaters).  Other suitable thin film
resistors are available from Kyocera inc.

Figures **2, 3,** and **4** show different embodiments of the heating element.  A
thick backing layer **54** can be used to add strength to the heating element and also
conduct heat away from the thin film resistor **52**.  In addition, a high conductivity layer

15     **50** can be placed between the thin film resistor **52** and target tissue to improve
temperature uniformity across the surface of the heating element. For most applications
the thin film resistor **52** and optional high conductivity layer **50** is less than 500 µm thick
to reduce the total energy available for tissue heating and keep the duration of the
thermal pulse short.  A temperature sensor **34** can be integrated into the backing layer

20     **54** to monitor temperature.  For most applications the surface area of the heating
element is approximately 1 cm².

Figure 5 shows a cross-sectional view of an alternative embodiment of the handheld treatment device 10. In this embodiment, flash lamps 130 are used to quickly heat a thin absorbing layer 120. A circuit board 100 can fire one or multiple lamps to control the total energy delivered to the thin absorbing layer 120. A reflector 140

5    collects the light that is radiated away and redirects it toward the absorbing layer 120 to uniformly heat the absorbing layer 120. In addition, with multiple flash lamps the lamps can be fired in a controlled sequence to control tissue heating. Multiple pulses can be used to lower the peak temperature but increase the total energy deposited and increase the effective depth of heating. The pulse width of each flash lamp can also be

10    different. In addition, each flash lamp can be optically filtered to deliver a different spectrum to the absorbing layer or tissue.

Figures 6, 7, and 8 show different embodiments of the optical heating element 120. A thick transparent backing layer 154 can be used to add strength to the thin absorbing layer 152. In addition, a high conductivity layer 150 can be placed between

15    the thin absorbing layer 152 and target tissue to improve temperature uniformity across the surface of the heating element. For most applications the thin absorbing layer 152 and the optional high conductivity layer 150 is less than 500 µm thick to reduce the total energy available for tissue heating and keep the duration of the thermal pulse short. The absorbing layer can be glass or a high temperature polymer with absorbing dye or

20    particles. A temperature sensor 34 can be integrated into the backing layer 54 to monitor temperature. For most applications the surface area of the heating element is approximately 1 cm².

The optical absorbing layer can also be designed to allow some light to be transmitted. For example, blue and/or UV light could be transmitted to interact directly with tissue and kill bacteria directly. Alternatively, red light which has been shown to reduce inflammation can be transmitted to the tissue.

5          In another embodiment of the present invention the flash lamps are replaced by a plurality of high power light emitting diodes, or a diode laser source. The emitted light is directed at the absorbing layer and heats it quickly (less than 0.5 sec) to the desired temperature.

The heating element in the present invention will quickly cool by thermal
10     conduction into tissue (and if present into the backing layer as well). The maximum energy that can be transferred to the skin is controlled by the peak temperature and the thickness of the heated layer. For example, for a 100 μm thick absorbing glass layer heated to 300 °C the available energy to transfer to tissue that is at 30 °C is approximately 2.5 g/cc * 100e-4 cm * (270 °C) * 0.84 J/g/°C = 5.7 J/ cm². If we
15     assume heating of the thin layer occurs within a short time then the cooling time can be estimated from the thermal relaxation time. The relaxation time is approximately (100e-4/3.14)² /0.008= 1.2 msec. For a 100 μm thick copper layer heated to 300 °C the available energy to transfer to tissue that is at 30 °C is approximately 9.2 J/ cm². The relaxation time is approximately 8.65 μsec. Table 1 and Table 2 below summarize the
20     relaxation time and required energy for different materials and thickness.

**Table 1:** Relaxation time for different materials of specified thickness (assuming planar)

| Material | Relaxation Time [μseconds] (100 μm thick) | Relaxation Time [μseconds] (200 μm thick) |
|---|---|---|
| aluminum | 10.45 | 41.8 |
| copper | 8.65 | 34.6 |
| Glass | 1220.75 | 4883 |
| Graphite | 12.675 | 50.7 |
| Water | 7237.2 | 28948.8 |

Table 2: Energy per cm² required to heat material of specified thickness by 270 C

| Material | Energy [Joules/cm²] (100 μm thick) | Energy [Joules/cm²] (200 μm thick) |
|---|---|---|
| aluminum | 6.78 | 13.56 |
| copper | 9.2 | 18.4 |
| glass | 5.67 | 11.34 |
| graphite | 3.45 | 6.9 |
| water | 11.3 | 22.6 |

Appropriate selection of materials allows one to control the peak tissue

5    temperature and duration.

Figure 9 shows another embodiment of the handheld acne treatment device

that integrates a protective shield 180 to prevent the user from positioning the device on

the eye.

Figure 10 shows one possible circuit diagram to pulse the flash lamp.  A

10    switch 200 is turned on to activate the device and charge the capacitor 220.   When the

capacitor is fully charged a lamp 230 (or LED) turns on and the circuit is ready to fire.

Push button **250** is pressed to trigger the flash lamp which discharges capacitor **220**. After firing the capacitor **220** again begins to charge and after several seconds (depending on battery and resistance) is fully charged. This circuit releases a maximum energy per pulse of $\frac{1}{2} CV^2$ where C is the capacitor capacitance and V is the final

5    voltage across the capacitor. By selecting appropriate values of C, and V the released energy can be kept below the threshold for tissue burns.

Figure 11 shows how the present invention would be used to treat a blemish on the face. The device **10** is activated and then placed in contact with the skin, when in good contact and fully charged the fire button is pressed to deliver energy to the

10   heating element which then transfers its energy to the skin. The thermal impulse to the skin acts to open pores and accelerate clearing of the blemish. In some cases multiple treatments in one session maybe necessary to treat the blemish. In this case the minimum time between treatments is controlled by the circuit which prevents misuse and possible burns. It may also be necessary to perform multiple treatments through

15   the course of a day, or week to treat some blemishes.

The above descriptions and illustrations are only by way of example and are not to be taken as limiting the invention in any manner. One skilled in the art can substitute known equivalents for the structures and means described. The full scope and definition of the invention, therefore, is set forth in the following claims.

20

We claim:

1. A device for delivering a controlled amount of thermal energy to tissue comprising:

   a resistive heating element,

   a circuit to deliver a fixed amount of energy to said resistive heating element,

   means to activate and trigger circuit.

2. A device for delivering a controlled amount of thermal energy to tissue comprising:

   an optical absorbing element,

   a plurality of flash lamps,

   a circuit to deliver a fixed amount of energy to said plurality of flash lamps,

   means to activate and trigger circuit.

3. A method for treating skin blemishes comprising:

   applying a device with an element that can be quickly heated to temperature greater than 50 °C to the skin,

   triggering a  circuit to release a fixed amount of energy to the heated element,

   allowing heat to conduct into the skin.

# SKIN TREATMENT DEVICE

## ABSTRACT OF THE DISCLOSURE

The present invention relates to the fields of skin care.  More particularly, the

5      invention relates to a device and method for treating acne, removing fine wrinkles, and

clearing skin.  The device comprises an element that can be quickly heated and then

transfers a controlled amount of energy to tissue.



**Figure 1**



**Figure 2**



**Figure 3**



**Figure 4**



**Figure 5**



**Figure 6**

34

154

152

150



154

152

**Figure 7**

152

**Figure 8**



**Figure 9**



**200**

**220**

**230**

**250**

# Figure 10



**Figure 11**

<u>SKIN TREATMENT DEVICE</u>

5

Luiz B. Da Silva          (USA)

1995 Camino Ramon Place

Danville, CA 94526


Joseph Neev          (USA)

950 Alcapulco St.

Laguna Beach, CA 92561


George Choi          (USA)

3239 Oak Knoll Drive

Redwood City, CA 94062

10

15

20

PATENT APPLICATION SERIAL NO. _____

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

12/14/2004 FHETEKI1 00000091 60634904
01 FC:2005                    100.00 OP

PTO-1556
(5/87)

*U.S. Government Printing Office: 2002 — 489-267/69033

1       **PROOF OF SERVICE**

2 STATE OF CALIFORNIA, COUNTY OF ORANGE

3   I am employed in the County of Orange, State of California. I am over the
age of 18 and am not a party to the within action; my business address is 3121
4 Michelson Drive, Suite 250, Irvine, California 92612.

5   On **May 6, 2008**, I served a true and correct copy of the document(s)
described as **FIRST AMENDED COMPLAINT** on interested parties in this
6 action by placing true copies thereof enclosed in sealed envelopes as set forth
below:

7

8 Sallie Kim
GCA Law Partners LLP
1891 Landings Drive
9 Mountain View, CA 94043
Fax: (650) 428-3901

10

11   ☒ **(By U.S. Mail)** I am readily familiar with my employer's business
practice for collection and processing of correspondence for mailing with the
United States Postal Service. I am aware that on motion of the party served, service
12 is presumed invalid if postal cancellation date or postage meter is more than one
day after date of deposit for mailing in affidavit. I deposited such envelope(s) with
13 postage thereon fully prepaid to be placed in the United States Mail at Irvine,
California as indicated above.

14

15   ☐ **(By Facsimile)** I served a true and correct copy by facsimile pursuant
to C.C.P. 1013(e), calling for agreement and written confirmation of that agreement
or court order, to the number(s) listed above or on attached sheet. Said
16 transmission was reported complete and without error.

17   ☐ **(By Electronic Delivery)** I served a true and correct copy by
electronic delivery pursuant to C.C.P. 1010.6, calling for agreement to accept
18 service by electronic delivery, to the interested parties in this action as indicated
above.

19

20   ☐ **(By Hand Delivery)** I caused such document(s) to be delivered by
hand to the office of the addressee(s) as indicated above.

21   ☐ **(By Express Service)** I served a true and correct copy enclosed in a
sealed package, for collection and for delivery marked for next day delivery in the
22 ordinary course of business, addressed to the office of the addressee(s) as indicated
above.

23

24   ☒ **(STATE)** I declare under penalty of perjury under the laws of the State
of California that the foregoing is true and correct.

25   Executed on **May 6, 2008**, at Irvine, California.

26

27         _____
         Jayne Rieder
28

1

### CERTIFICATE OF SERVICE

2

3      I, the undersigned declare:

4      I am employed in the County of Santa Clara, California.  I am over the age of

5  eighteen years and not a party to this action.  My business address is 1891 Landings Drive,

6  Mountain View, California 94043.

7      On the date set forth below, I caused the following document(s):

8      NOTICE OF REMOVEAL PURSUANT TO 28 U.S.C. §1441(b)

9  to be served on  interested parties by the following manner:

10
    [X]    **(BY MAIL)** By placing a true copy of said document(s), enclosed in a sealed envelope with postage
11         thereon fully paid, for collection and mailing on the date set forth herein following ordinary business practices,
           in the United States mail, at the offices of GCA Law Partners LLP.  I am readily familiar with the business
12         practices of my firm, GCA Law Partners LLP, for the collection and processing of correspondence for mailing
           with the United States Postal Service and that correspondence is deposited with the United States Postal
13         Service that same day in the ordinary course of business.

14   [ ]    **(BY HAND DELIVERY)** By causing a true copy thereof, enclosed in a sealed envelope, to be
           delivered by hand to the parties indicated below.
15

16   [ ]    **(BY OVERNIGHT DELIVERY)** By placing a true copy thereof, enclosed in a sealed Federal
           Express envelope, with delivery charges prepaid, for collection and overnight delivery on the date set forth
17         herein following ordinary business practices, in Federal Express mail, at the offices of GCA Law Partners LLP.
           I am readily familiar with the business practices of my firm, GCA Law Partners LLP, for the collection and
18         processing of correspondence for overnight mailing with Federal Express and that correspondence is delivered
           to a Federal Express agent for delivery that same day in the ordinary course of business.
19

20   [ ]    **(BY FACSIMILE TRANSMISSION)** By transmitting via facsimile the document(s) listed
           above from the following facsimile machine telephone number:  (650) 428-3901 to the parties and facsimile
21         number(s) listed below.
                  Upon completion of the said facsimile machine transmission, the transmitting machine issued a
22         transmission report showing the transmission was complete and without error.  A copy of said transmission
           report is attached hereto.

23

24

25

26

27

28

Certificate of Service                                    –1–

Kenneth G. Parker
Robert G. Loewy
Teuton, Loewy & Parker LLP
3121 Michelson Drive, Suite 250
Irvine, California 92612

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Mountain View, California on the 9th day of June, 2008.

Tina Y. Ernst

# EXHIBIT B

## CERTIFICATE OF SERVICE

I, the undersigned declare:

I am employed in the County of Santa Clara, California. I am over the age of eighteen years and not a party to this action. My business address is 1891 Landings Drive, Mountain View, California 94043.

On the date set forth below, I caused the following document(s):

NOTICE OF REMOVEAL PURSUANT TO 28 U.S.C. §1441(b)

to be served on  interested parties by the following manner:

[ X]    **(BY MAIL)** By placing a true copy of said document(s), enclosed in a sealed envelope with postage thereon fully paid, for collection and mailing on the date set forth herein following ordinary business practices, in the United States mail, at the offices of GCA Law Partners LLP. I am readily familiar with the business practices of my firm, GCA Law Partners LLP, for the collection and processing of correspondence for mailing with the United States Postal Service and that correspondence is deposited with the United States Postal Service that same day in the ordinary course of business.

[ ]    **(BY HAND DELIVERY)** By causing a true copy thereof, enclosed in a sealed envelope, to be delivered by hand to the parties indicated below.

[ ]    **(BY OVERNIGHT DELIVERY)** By placing a true copy thereof, enclosed in a sealed Federal Express envelope, with delivery charges prepaid, for collection and overnight delivery on the date set forth herein following ordinary business practices, in Federal Express mail, at the offices of GCA Law Partners LLP. I am readily familiar with the business practices of my firm, GCA Law Partners LLP, for the collection and processing of correspondence for overnight mailing with Federal Express and that correspondence is delivered to a Federal Express agent for delivery that same day in the ordinary course of business.

[ ]    **(BY FACSIMILE TRANSMISSION)** By transmitting via facsimile the document(s) listed above from the following facsimile machine telephone number: (650) 428-3901 to the parties and facsimile number(s) listed below.
 Upon completion of the said facsimile machine transmission, the transmitting machine issued a transmission report showing the transmission was complete and without error. A copy of said transmission report is attached hereto.

Certificate of Service                                        –1–

1

2    Kenneth G. Parker
     Robert G. Loewy
3    Teuton, Loewy & Parker LLP
     3121 Michelson Drive, Suite 250
4    Irvine, California 92612

5        I declare under penalty of perjury under the laws of the State of California that the

6    foregoing is true and correct.  Executed at Mountain View, California on the 9th day of

7    June, 2008.

8

9

10                              _Ti Y. East_____

11                              Tina Y. Ernst

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

POS-040

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Sallie Kim, State Bar No. 142781<br>Kimberly A. Donovan, State Bar No. 160729<br>GCA Law Partners LLP<br>1891 Landings Drive<br>Mountain View, CA 94043<br>TELEPHONE NO.: (650) 428-3900     FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):*<br>ATTORNEY FOR *(Name):* Def.'s - G. Choi, L. Dasilva & Therative, Inc. | FOR COURT USE ONLY<br><br>ENDORSED<br>FILED<br>ALAMEDA COUNTY<br><br>JUN 0 9 2008<br><br>CLERK OF THE SUPERIOR COURT<br>B. KMEL DHILLON  Deputy |
|---|---|

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Alameda
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS:
CITY AND ZIP CODE: Oakland, California 94612-4293
BRANCH NAME:

| PETITIONER/PLAINTIFF: Neev v. Choi, et al.<br><br>RESPONDENT/DEFENDANT: | |
|---|---|

| PROOF OF SERVICE—CIVIL<br>**Check method of service** *(only one):*<br>☐ By Personal Service   ☑ By Mail   ☐ By Overnight Delivery<br>☐ By Messenger Service   ☐ By Facsimile   ☐ By E-Mail/Electronic Transmission | CASE NUMBER:<br>RG 08379458<br><br>JUDGE:<br><br>DEPT.: |
|---|---|

*(Do not use this Proof of Service to show service of a Summons and Complaint.)*

1. At the time of service I was over 18 years of age and **not a party to this action.**

2. My address is *(specify one):*

   a. ☑ Business:                               b. ☐ Residence:

   1891 Landings Drive
   Mountain View, CA 94043

3. On *(date):*                    I served the following **documents** *(specify):*

   June 9, 2008               Notice to State Court Clerk of the Filing the Notice of Removal

   ☐ The documents are listed in the *Attachment to Proof of Service–Civil (Documents Served)* (form POS-040(D)).

4. I served the documents on the **persons** below, as follows:

   a. Name of person served: Kenneth G. Parker/Robert G. Loewy
                                 Teuton, Loewy & Parker LLP
   b. Address of person served: 3121 Michelson Drive, Suite 250
                                 Irvine, California 92612

   c. Fax number or e-mail address of person served, if service was by fax or e-mail:

   d. Time of service, if personal service was used:

   ☐ The names, addresses, and other applicable information about the persons served is on the *Attachment to Proof of Service—Civil (Persons Served)* (form POS-040(P)).

5. The documents were served by the following means *(specify):*

   a. ☐ **By personal service.** I personally delivered the documents to the persons at the addresses listed in item 4.
      (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

| Form Approved for Optional Use<br>Judicial Council of California<br>POS-040 [New January 1, 2005] | PROOF OF SERVICE—CIVIL<br>(Proof of Service) | Code of Civ. Proc., §§ 1011,<br>1013, 1013a, 2015.5<br>www.courtinfo.ca.gov |
|---|---|---|

American LegalNet, Inc.
www.USCourtForms.com

| CASE NAME Neev v. Choi et al. | CASE NUMBER: RG 08379458 |
|---|---|

5 b. [✓]  **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 4 and *(specify one):*

   (1) [ ]   deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

   (2) [✓]   placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at *(city and state):* Mountain View, California

  c. [ ]  **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 4. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

  d. [ ]  **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in item 4 and providing them to a professional messenger service for service. *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)*

  e. [ ]  **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in item 4. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

  f. [ ]  **By e-mail or electronic transmission.** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed in item 4. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: June 9, 2008

Tina Ernst
_____
(TYPE OR PRINT NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

*(If item 5d above is checked, the declaration below must be completed or a separate declaration from a messenger must be attached.)*

### DECLARATION OF MESSENGER

[ ]  **By personal service.** I personally delivered the envelope or package received from the declarant above to the persons at the addresses listed in item 4. (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package, which was clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

At the time of service, I was over 18 years of age. I am not a party to the above-referenced legal proceeding.

I served the envelope or package, as stated above, on *(date):*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____
(NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

**PROOF OF SERVICE—CIVIL**
**(Proof of Service)**